UNITED STATES of America

v.

James CLAYBORNE, Appellant.

UNITED STATES of America

v.

William E. BROWN, Jr., Appellant.

Nos. 72–2152, 72–2192.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1973.

Decided Dec. 16, 1974.

Sherwood B. Smith, Jr., Washington, D. C., with whom Paul M. Vincent, Washington, D. C. (both appointed by this court), was on the brief, for appellant in No. 72–2152.

Fred Martin, law student,* for appellant in No. 72–2192. John G. Murphy, Jr., Washington, D. C., with whom Sherman L. Cohn, Washington, D. C. (appointed by this court), and Patricia A. Seitz,* law student, were on the brief for appellant in No. 72–2192.

Richard L. Beizer, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Brian W. Shaughnessy, Asst. U. S. Attys., were on the brief for appellee. Stephen W. Grafman, Asst. U. S. Atty., also entered an appearance for appellee.

* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this court.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

MacKINNON, Circuit Judge:

James Clayborne and William E. Brown, Jr. were charged with (1) first degree felony murder,[1] (2) first degree premeditated murder,[2] (3) attempted robbery while armed[3] and (4) attempted robbery.[4] In addition, Clayborne was charged with carrying a pistol without a license.[5] After a jury trial both appellants were convicted of second degree murder[6] as a lesser included offense of first degree premeditated murder.[7] Clayborne was also found guilty of carrying a pistol without a license.[8] Clayborne was sentenced to concurrent terms of imprisonment of 15 to 45 years for the murder and one year for carrying the pistol. Following a Youth Corrections Act[9] report on Brown, he was sentenced under section 5010(c) of that Act[10] to a period of commitment not to exceed 10 years. The appeals of both men have been consolidated for all purposes. We affirm.

I

■ As we must, we set forth the facts most favorable to the jury's verdict. Connie Jackson, a 15-year-old girl at the time, was at her home when James Clayborne and William Brown arrived there a little after 1 P.M. on May 12, 1971 (Tr. 234). Clayborne was carrying two plastic bags, one containing a number of watches and the other containing two guns. He showed Connie the bags and attempted to sell some of the watches to her and to her friend Freddy Hooks (Tr. 171–172). He also showed Freddy two pistols from the other bag and attempted to sell them to him (Tr. 172–173). While appellants were at the Jackson home an insurance man (Leonard Spiro) came to see Connie's mother, Mrs. Jackson (Tr. 175, 176–178). When he found that Mrs. Jackson was not there the insurance man left. Clayborne and Brown then talked between themselves (Tr. 177) and "left right behind" the insurance man—"a few minutes" (Tr. 177) after his departure. Connie then went and looked out the window in the direction Clayborne and Brown had gone (Tr. 178). Connie testified that before they left Clayborne had "two bags in his hand" (Tr. 177). When Clayborne and Brown went outside the house "the insurance man [was] out there" (Tr. 177) and Connie stated that she saw Clayborne and the insurance man fighting (Tr. 178, 180). At that time Brown, not Clayborne, was carrying the two bags and he (Brown) was "down the street . . . 25 feet" (Tr. 178, 179) from the point where Clayborne and the insurance man were fighting. Clayborne had approached the insurance man and later chased him with a gun in his hand (Tr. 180–181). Thus, while Brown was standing by holding the bags, Clayborne chased the insurance man, shot him once in the eye and then ran away (Tr. 181–183). After the shooting Brown ran down the parking lot to his home (Tr. 184–185). The insurance man died as a result of the shot fired by Clayborne.

■ The foregoing facts present adequate evidence of Clayborne's guilt and raise a question for the jury as to whether Brown, in his conversation with Clayborne before the shooting, by his actions

1. D.C.Code § 22–2401 (1973).

2. Id.

3. Id. §§ 22–2902, 22–3202.

4. Id. § 22–2902.

5. Id. § 22–3204.

6. Id. § 22–2403.

7. As to Clayborne the court granted acquittals on all charges except first degree premeditated murder and carrying a pistol without a license. As to Brown the court granted acquittals on all charges except second degree murder as a lesser included offense of first degree premeditated murder (Tr. 368).

8. Note 5, supra.

9. 18 U.S.C. § 5010(e).

10. Id. § 5010(c).

in taking the two bags of valuables, holding them while Clayborne accosted the insurance man and standing by during the fighting and shooting, and by his flight following the shooting, indicated his participation in the crime and aided and abetted Clayborne.in the commission of the offense. The entire evidence was such that it was permissible for the jury to conclude that Brown had aided and abetted the offense, that the two men were acting in concert and conniving[11] concerning the offense immediately prior to their pursuit of the victim. This conclusion is supported by testimony that Brown and Clayborne had been seen standing together restlessly throughout the morning of the day in question (Tr. 232–234), and that Brown took the two bags, which Clayborne had previously carried, as soon as they left the Jackson house and held the bags while the assault on the insurance man by Clayborne was in progress. During this time Brown was also standing nearby, sufficiently close that he could have helped Clayborne in the fight had his assistance been necessary. Brown's presence was also consistent with a conclusion that he was acting as a lookout, and his holding of the bags could be interpreted as aiding and abetting[12] Clayborne in the shooting since Clayborne would have found it difficult, if not impossible, to chase, fight and shoot the insurance man if he had been required at the same time to carry two bags containing watches and guns.

Appellants request that we reverse these convictions principally on the claim of inadequate assistance of defense counsel because of the refusal of counsel for both appellants, on tactical and other grounds,[13] to cross-examine Connie, the Government's principal witness.

## II

Since appellants' major arguments in support of the claim that they were denied the effective assistance of counsel are so well set forth in Judge Bazelon's dissenting opinion, drafted prior to this opinion, the following discussion will be addressed principally to the main points referred to in the dissent.

■ The dissent points first to the claimed defects in Connie's testimony, to her youth,[14] to some of the vacillation in her testimony, to some contradictions, to her unwillingness to testify and to her fear of reprisals for her testimony. This characterization of her attitude and performance is accurate, but these factors were apparent to the jury, they went to the issue of her credibility, and the jury was the proper tribunal to weigh and consider them.

■ Next the dissent points out that defense counsel had not interviewed Connie, that Connie originally refused to testify on grounds of alleged self-incrimination (Tr. 128), that a lawyer outside the case was appointed to counsel her on this point and that he informed the court that her refusal to testify was due to fear of reprisal. This intimidation came, not from the lawyers, but apparently from the defendants (Tr. 200) and members of the community in which all parties lived (Tr. 202). The trial judge observed intimidation of Connie in open court by appellants, especially Brown, and he pointed it out to defense counsel. Since it was apparent to the judge he also considered that it was apparent to

---

11. D.C.Code § 22–105(1973) provides:

   *§ 22–105. Persons advising, inciting, or conniving at criminal offense to be charged as principals.*

   In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applica-

   ble in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be. (Mar. 3, 1901, 31 Stat. 1337, ch. 854, § 908.)

12. *Id.*

13. The grounds are fully set forth in the statement of counsel. *See* Appendix A *infra.*

14. She was 15 at the time of the offense and 16 at the time of the trial.

the jury. When Connie persisted in her refusal to testify she was cautioned by the judge of the likelihood of being charged with perjury and was then adjudged to be in civil contempt and ordered to jail. That order was subsequently remanded and she was placed in protective custody for the night with her mother at a place remote from their usual habitation. However, she was again warned that she would be jailed the next day if she persisted in her refusal to testify.

The next day she agreed to testify. As the dissent points out, following an interview of the witness, defense counsel raised questions as to whether she felt compelled to testify in conformance with her original statement to the police or with her grand jury testimony, which varied in one or two particulars. The argument on this point see-sawed back and forth between respective counsel until the court finally and properly resolved the situation by advising Connie in open court: "The testimony you give in answer to the questions being put to you is to be the truth and only the truth. . . . [G]ive the truth as best you can recollect it" (Tr. 168). She then went on to testify, but because they considered it to be in the best interests of their clients, *all* defense counsel refused to cross-examine her for the reasons subsequently set forth in a statement filed with the court after the trial. See Appendix A. We find these reasons adequate to support their decisions. *In fact, reasons numbered 4 and 5 would each alone have been adequate to support such decisions.* These explanations point to the fact that had Connie testified further, there was a strong likelihood she would have testified to additional facts that would have supplied factual elements from which the jury might have found both appellants guilty of first degree felony murder or premeditated murder as well as armed robbery and robbery.[15]

## III

The dissent argues that practically all the reasons given by counsel for not cross-examining Connie were attributable to a failure to interview the witness or do adequate research. This is pure speculation. Moreover, it is incorrect to imply that the defense did not have adequate knowledge of the facts. Connie was a reluctant witness and no law compelled her to submit to an interview. But she was the girl friend of Clayborne's brother and he wrote to "her repeatedly with regard to her testimony which he knew of about the case" (Tr. 150). Moreover, Connie personally visited Clayborne in jail (Tr. 150, 381, 438A). Clayborne testified that Connie "[came] to visit [him] . . . over at the jail . . . about nine or ten [times and that he] did . . . discuss the case with Connie Jackson over at the jail" (Tr. 381). *He knew she was going to be a witness* (Tr. 384). Under such circumstances to contend that Clayborne's counsel were uninformed of Connie's attitude and of what she knew of the murder and that they made their decision not to cross-examine in a vacuum of facts is incredible. In such circumstances no court should be so naive as to presume that defendants' trial counsel were ignorant of Connie's knowledge. Defendants' counsel on appeal and the dissent fail to recognize that trial counsel had their own clients as sources of information; with the numerous contacts between Clayborne, his brother and Connie under the circumstances here existing it was not necessary for them to interview Connie personally to learn what she would testify to if she told the truth. We will not close our eyes to what any reasonable person would conclude under such circumstances. From

15. Part of Connie's statement to the police, of which defense counsel were aware, was more incriminating:

When James [Clayborne] started whispering I knew he was going to do something so I went upstairs to the third floor bedroom and looked out the window and saw the insurance man and James fighting over by the steps and Little William [Brown] was standing a little ways away watching. Tr. 113.

the testimony read into the record, see page 478 *infra*, Brown's counsel knew of the possible contradiction in Connie's testimony, and he may have believed that an interview would do nothing but confirm that his client had the bags, flag that fact as important in Connie's mind, and prevent any possible contradiction from arising in her testimony before the jury. Indeed, for whatever cause, Connie did state to the jury at one time (Tr. 193) that she did not remember whether Brown had been holding any bags—a lapse of memory that Brown's counsel attempted to capitalize upon in his summation (Tr. 487)—but Connie's *final statement* was that Brown had "two bags" in his hand (Tr. 195, see also Tr. 177–178). In choosing whether to cross-examine Connie, defense counsel were aware that her testimony that Clayborne had *only* a gun in his hand (Tr. 181) when he was chasing the insurance man, though he had the two bags in his hands immediately prior thereto, also implicitly corroborated her testimony that previously he had given the two bags to Brown, his companion throughout the day.

Connie's May 18, 1971, statement to the police and her grand jury testimony were also available to the defense (Tr. 120) and in fact were completely read into the record, out of the presence of the jury (Tr. 112–119, 120–126), before all the defense counsel decided not to cross-examine her. Brown, moreover, had made a statement to the police "that implicate[d] himself and Clayborne" (Tr. 26, 28) and Clayborne also told another person that he "had committed the offense" (Tr. 26) and that "William Brown was along with him" (Tr. 28). Defense counsel were aware of this possible testimony.

While it is not directly relevant to the specific objections raised to counsel's performance, we note also that Brown's counsel appeared well prepared and effective in respect to other facets of the trial, for example, in suggesting specific modifications to the charges (*e. g.*, Tr. 408–14, 431, 437–41). Discussing the nature of aiding and abetting (the defense adopted from the beginning) (*e. g.* Tr. 91–92, 326–33, 485–90), and obtaining the dismissal of four out of the five charges against Brown. And in final argument counsel for both defendants informed the jury of tactical reasons for not cross-examining Connie in a manner designed to benefit their clients' cases (Tr. 483, 486). Each defendant here was defended by highly skilled and experienced trial counsel, and we are convinced that their decisions were permissible tactical decisions.[16] Moreover, their tactics were highly successful in that they secured acquittals on two first degree murder charges for each defendant and also acquittals on both robbery charges.

█ It thus appears that defense counsel did a creditable job in the face of the strong adverse proof that confronted their clients. In evaluating the quality of their representation, it must be recognized that it is rather difficult to get an acquittal for clients whose crime is viewed in broad daylight by a disinterested, credible eyewitness who knows the defendants personally. In any event obtaining a complete acquittal should not be the measure of a defense lawyer's competency and effectiveness. It is the task of counsel merely to attempt by all honorable means to see that justice is done. The lawyers here obtained acquittals for their clients on first degree murder and robbery charges and did not breach their duties to their clients by their decisions not to cross-examine a witness who, if she testified truthfully, could only further damage their clients.[17] To say that such conduct by defense lawyers constitutes inade-

---

16. *See* Appendix A.

17. Counsel pointed out that the witness might have testified on cross-examination or re-direct examination in more specific detail as to

attempted robbery and premeditation. This was a very definite hazard, obvious to anyone, and counsel could only be considered to be acting in their clients' best interests by not subjecting them to these risks.

quate assistance of counsel is not only wrong, it is grossly unfair to competent counsel.

■ It is a difficult task for a court to attempt to tell experienced defense counsel *how* to defend their clients—particularly with respect to cross-examination and trial tactics. Some lawyers and judges feel that acquittals in criminal cases can be won by vigorous cross-examination of all prosecution witnesses. But cross-examination is a sharp two-edged sword and more criminal cases are won by not cross-examining adverse witnesses, or by a very selective and limited cross-examination of such witnesses, than are ever won by demolishing a witness on cross-examination. Knowing when *not* to cross-examine an adverse witness is the art of cross-examination at its highest.[18] This is so because cross-examination very frequently operates to emphasize the critical points in a witness' testimony, and although it may initially be helpful to the defense in some instances, points on cross-examination can usually be answered and discrepancies explained in favor of the prosecution by re-direct examination. The decision whether to cross-examine a witness is peculiarly one for defense counsel and his judgment should be entitled to great respect by the court.

■ The methodology implicit in allowing reversal of convictions for error of defense counsel has many troublesome elements. A defense lawyer, as a legitimate tactic, takes certain action that he considers to be in the best interest of his client. Declining to cross-examine or to fully cross-examine an adverse witness is a common example. Then, on appeal, at the urging of a newly appointed appellate counsel, whose appointment only for purposes of the appeal insulates him from responsibility for the decisions of trial counsel, a panel of the appellate court would second guess the trial lawyers, speculate about what evidence might have been produced and conclude that the conviction of the accused should be reversed, not for judicial error nor for error of the prosecution, but for the claimed error of *the accused's* trial lawyer, *i. e.*, the court would speculate that evidence might have been presented more favorably to the accused, and then surmise that the evidence would have gone so far as to influence the jury to acquit. Because of the inherent hazards to the administration of justice of ordering reversals on such grounds, reversal should never be based upon the good faith tactics of defense lawyers except upon the clearest proof of actual prejudice.

### IV

■ As to appellants' claim that Connie could have been "severely impeached" on cross-examination by evidence that she was compelled to testify "only after she was threatened by a contempt citation," the statement by the trial judge fully informed the jury as to such particulars:

> THE COURT: . . . I wish to make this statement for the record at this time. Miss Connie Jackson testified in this Court, because she was compelled to.
>
> She was subpoenaed here. She did not want to. It was obvious. Yesterday by this Court she was held in con-

---

18. A good example of the delicate nuances of cross-examination was given in a recent feature story in the *Washington Post* which reported a conversation between a Watergate prosecutor and his opponent, a noted defense lawyer:

> "I was at the trial," says John Seigenthaler, "when Jim Neal walked up to John Wilson (Haldeman's lawyer) and said, 'Why are you goin' so soft on John Dean? I thought you'd go after him hammer and tongs.'

> "And Wilson, he says, 'The hell you did. You would have done just what I did. And the way I did it.'
> "And Neal—he just laughed. And then he said, 'You're right. You're absolutely right. I would've done it just the way you did.' "

*Washington Post*, Nov. 10, 1974, § L at 3: "Watergate Prosecutor Neal: Shrewd Tennessee Lawyer."

tempt. She could have served time in jail for that contempt.

She purged herself of the contempt today by her testimony, testimony that she had to give.

Tr. 207.

As to the possibility that Connie was influenced by a $5,000 reward, Clayborne testified to this effect (Tr. 381–382) and his testimony was uncontradicted. From the perspective of the defense this was a better way to highlight the point than to cross-examine Connie on the point, hazard a denial that it influenced her, and then face the possibility of her mother denying the claim. One trouble with trying to impeach Connie was that Clayborne's defense was an alibi, based on his own testimony. Brown did not testify. Also, Clayborne's alibi was rebutted by Luvenia Brown (Tr. 232–239), and Mr. McNeal testified that he saw two boys fitting the description of Clayborne and Brown running from the scene of the murder right after he "heard a shot" (Tr. 223) at about the time the murder was committed. Chester Brown, a permanent resident in the housing area where the crime was committed who knew both Clayborne and Brown, testified that later in the day on May 12th he asked Clayborne "Did you do it [kill the insurance man]?" and "He said yes" (Tr. 213–221). On cross-examination he testified he didn't think Clayborne was serious because he laughed, but thereafter he had doubts (Tr. 221). Connie's testimony was also corroborated by other testimony as to the exact place of the crime and the fact that the men ran.

Clearly all this evidence presented a jury question.

Appellants and the dissent argue that the inadequacies of defense counsel blotted out [19] the sole defense of Clayborne and Brown, but a more accurate appraisal indicates that the tactics of counsel blotted out evidence of robbery and premeditation and that counsel were successful in securing a conviction for their clients on the lesser included charge of second degree murder instead of the first degree felony murder, premeditated murder and robbery charges. In reaching this conclusion, we do not find support in the record for the charge that counsel in any way violated any of the "duties owed by counsel to a client" as set forth in United States v. DeCoster, 159 U.S.App.D.C. 326, 332, 487 F.2d 1197, 1203 (1973).

## V

■ Both appellants claim the evidence was insufficient to support the verdict against them. We disagree. Judge Bazelon's opinion in note 2 addresses this point and distinguishes Brown's factual situation from that present in our decision in Bailey v. United States, 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969). The continuous association of Brown with Clayborne beginning early in the morning, their arrival at the Jackson home together, their furtive consultation immediately preceding the murder by Clayborne, Brown's holding both bags of valuables that Clayborne had carried moments earlier and standing close by while Clayborne fought with and shot the insurance man, together constituted sufficient facts to support the court's decision to leave the issue to the jury. Though the evidence was close—closer as to Brown than as to Clayborne—it was sufficient to influence a jury to convict by the required standards.[20] Close cases are for the triers.[21] The aiding and abetting statute of the District of Columbia,[22] insofar as this case is concerned, is not substantially different from the federal statute on the same subject.[23] Both require proof that the accused knowingly associated himself in some manner with the criminal ven-

---

**19.** Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968).

**20.** Crawford v. United States, 126 U.S.App. D.C. 156, 375 F.2d 332 (1967).

**21.** Thompson v. United States, 132 U.S.App. D.C. 38, 39, 405 F.2d 1106, 1107 (1968).

**22.** D.C.Code § 22–105 (1973), set forth in note 11 *supra*.

**23.** 18 U.S.C. § 2 (1970).

ture, that he participated in it as in something he wished to bring about and that he sought by his actions to make it succeed.[24] There was no direct proof that Brown shared Clayborne's ultimately proved criminal intent to murder the insurance man, but proof of such intent is not required.

> It is well settled . . . that he need not necessarily have intended the particular crime committed by the principal; an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him.

22 C.J.S. Criminal Law § 92 (1961); see United States v. De La Motte, 434 F.2d 289, 293 (2d Cir. 1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). The murder here was a natural and probable consequence of Brown's actions which permitted Clayborne to fight with the decedent with his hands free and to shoot him with a loaded weapon. The jury was thus justified in finding that the requirements for conviction had been met.

As for Clayborne, the evidence was clearly sufficient to support an instruction on first degree murder,[25] and in any event because of the acquittal on first degree any claim of reversible prejudice is weak.[26] ▮▮▮▮ We also hold that the court properly denied a missing witness in-struction with respect to the absence of Freddy Hooks as he was not within the "peculiar" control of the Government,[27] and also properly refused to allow the defense to comment on his absence.[28] The minor variation from the locally suggested instructions on aiding and abetting was insignificant and the refusal of the Government to supply a list of witnesses, as is required in capital cases (if it is still required) was harmless error since the only significant witness was known to the defense.[29]

We thus affirm the judgments of conviction of both appellants.

Judgment accordingly.

## APPENDIX A

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Criminal No. 2014–71

[Filed Nov. 1, 1972, James F. Davey, Clerk]

### UNITED STATES OF AMERICA

v.

### JAMES CLAYBORNE

### STATEMENT CONCERNING COUNSELS' DECISION NOT TO CROSS-EXAMINE

The defendant James Clayborne was charged with First Degree Murder-Premeditated and First Degree Murder-Fel-

---

24. Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949); United States v. Lumpkin, 145 U.S.App.D.C. 162, 167, 448 F.2d 1085, 1090 (1971); United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938).

25. See United States v. Brooks, 146 U.S.App.D.C. 1, 8, 449 F.2d 1077, 1084 (1971). From the testimony here the jury could deduce that before the murder Clayborne took the murder weapon from the bag containing two guns, gave the bags to Brown and then, with the gun in his possession, accosted, chased and shot the decedent.

26. See United States v. Dent, 155 U.S.App. D.C. 278, 477 F.2d 447 (1973).

27. See Burgess v. United States, 142 U.S.App. D.C. 198, 203, 204, 440 F.2d 226, 231, 232 (1970).

28. Id.; United States v. Young, 150 U.S.App. D.C. 98, 463 F.2d 934 (1972).

29. Status hearing, Tr. 10. Connie Jackson told Clayborne that she was going to testify (Tr. 384); she visited him 10 times in jail (Tr. 381, 483A), discussed the case with him (Tr. 381) and Clayborne's brother, who was Connie's boy friend, and wrote her a number of letters concerning the case (Tr. 150). Brown's attorney (Kramer) was also aware of who the witness was (Tr. 147).

ony Murder. The only eye witness produced by the Government was a 15 year old girl, Connie Jackson. On May 18, 1972 six days after the murder Connie Jackson gave a three page statement to the police indicating that she was a witness to the crime and alleging that the perpetrator of the crime was the defendant, Clayborne. The Government indicated that she was an uncooperative witness and she had been locked up by the Court for her refusal to testify. Before her testimony counsel for the defendant Clayborne took the position that she should not be permitted to testify because her statements would be inherently unreliable. Counsel for the defendant further took the position that counsel should be permitted to speak to the witness concerning her prospective testimony in order to prepare for cross-examination. The Court denied both requests.

In her direct testimony Miss Jackson confined her answers to but a few words. Twice she broke down, crying while on the stand. Counsel for the Government was not permitted by defense counsel to lead the witness. As a result the direct testimony of Miss Jackson was a great deal more sketchy than her statement of May 18, 1972.

The defense of Mr. Clayborne was that he was in the area but did not commit the crime. Further, he would allege when he took the stand that the statement made by Miss Jackson on May 18, 1972 was not true and that she had been pressured by her mother into giving that statement so that she could receive the substantial reward which had been offered.

Counsel for the defendant Clayborne decided not to cross-examine Miss Jackson for the following reasons:

1. To preserve counsels' position that the witness should not have been permitted to testify.

2. To preserve counsels' position that counsel should have been permitted to speak to Miss Jackson before she testified concerning her testimony.

3. The young witness had broken down twice and she presented a very sympathetic witness to the jury and a very difficult witness for any counsel to cross-examine.

4. Miss Jackson's direct testimony did not give a factual basis to support a charge of robbery or attempted robbery necessary for a felony-murder conviction. Had Miss Jackson been permitted by way of cross-examination or by a leading re-direct question to explain fully what allegedly occurred between the deceased and the defendant, James Clayborne, evidence of an attempted robbery most certainly would have come out.

5. Had Miss Jackson been permitted to explain in detail the manner in which the deceased had been allegedly shot by Mr. Clayborne there could well have been sufficient evidence to support the element of premeditation as a part of First Degree Murder.

6. Mr. Clayborne's defense could be presented without the cross-examination of Miss Jackson. Further, Mr. Clayborne's defense might well put the Government in a position requiring it to recall Miss Jackson in rebuttal to discredit Mr. Clayborne's testimony that she was lying in order to get reward money. If that occurred counsel would then be in a position to freely cross-examine Miss Jackson without the fear of a First Degree conviction.

As it turned out, the Court granted a motion for judgment of acquittal on the Felony Murder count (the count most feared by defense counsel) but did not grant the same motion on the premeditated count. Also, as it turned out, the Government decided not to recall Miss Jackson which put the defense in a position of being able to argue to the jury the fact that Mr. Clayborne's allegations concerning Miss Jackson remained unrebutted.

The jury convicted Mr. Clayborne of Second Degree Murder which meant of course that it believed Miss Jackson and disbelieved Mr. Clayborne. All four defense counsel felt that the tactic not to

cross-examine Miss Jackson prevented a First Degree conviction.

Respectfully submitted,

/s/ Charles Jarvis Murray
CHARLES JARVIS MURRAY
Associate Counsel

BAZELON, Chief Judge (dissenting):

In a joint trial, appellants were convicted by a jury of second degree murder;[1] Clayborne was also convicted of carrying a pistol without a license. The court today holds that the failure of trial counsel to interview or cross-examine the government's key witness did not deny appellants the effective assistance of counsel.[2] I cannot agree.

I.

An extensive discussion of the facts in this case is required to place the issue in proper perspective.

A. *Pre-Trial*

On May 18, 1971, six days after an insurance agent was shot, a Ms. Connie Jackson, fifteen years old, called the police stating she had information regarding the shooting. In her mother's presence, Ms. Jackson told the police the following story. Appellants Clayborne and Brown came to her house on the morning of the homicide. Clayborne was carrying two bags, one with watches, the other with pistols, and unsuccessfully tried to sell some of these items to Jackson and her boyfriend.[3] Shortly thereafter, Mr. Spiro, an insurance agent, arrived and inquired if Ms. Jackson's mother was at home. When told that she was not, he left. Thereupon, appellants "started whispering to each other and then they left." Jackson went upstairs to watch from her window and "saw the insurance man and [Clayborne] fighting . . . and [Brown] was standing a little ways away watching. The insurance man ran down the steps and [Clayborne] ran down the steps behind him and shot him," apparently with one of the guns previously shown to Jackson. During this time, Brown was holding the bag with the other gun and the bag with the watches. After the shooting, appellants fled in opposite directions, and five minutes later Clayborne returned to his apartment which was located near Ms. Jackson's.

Jackson further stated that on the day of the shooting she had "told her mother that the insurance man had been shot . . . and that [Clayborne] did it. Mother was mad and said it didn't make no sense. She told me not to tell the police." In response to a question from the investigating officer, Jackson stated that she eventually called the police be-

---

1. Appellants were indicted for first degree felony murder, first degree premeditated murder, attempted robbery while armed, and attempted robbery; Clayborne was also indicted for carrying a pistol without a license. At the close of the government's case, the trial court directed verdicts of acquittal on all the robbery counts, the felony murder counts, and the premeditated murder charge with respect to Brown. Brown was kept "in the case on second degree murder as an aider and abettor." The jury acquitted Clayborne on the premeditated murder charge, and convicted both appellants of second degree murder.

2. Relying heavily on Bailey v. United States, 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969), appellant Brown argues that the trial court's refusal to enter a judgment of acquittal on all counts against him was erroneous. The critical distinction between this case and *Bailey* is that here there was "guilty participation" by Brown in that he held the bags while Clayborne accosted the insurance agent. *See* p. 483 *infra*.

Appellant Clayborne argues that it was erroneous for the trial court to fail to direct a verdict of acquittal on his premeditated murder charge. Since he was acquitted by the jury on this count, however, appellant's challenge is answered by our opinion in United States v. Dent, 155 U.S.App.D.C. 278, 477 F.2d 447 (1973).

3. Jackson testified that her boyfriend was present during these events, although the record does not indicate whether he observed the shooting. The government claimed that it attempted to locate this witness but was unsuccessful. Defense counsel also indicated that they made a cursory effort to discover his whereabouts. Nothing further is reflected in the record, and the witness was unavailable for trial. The court denied appellants' request to "refer" to this missing witness.

cause "I got mad with Shela," who apparently was Clayborne's girlfriend.

Two months later, Jackson's statement to the police was read to her before a grand jury. When asked if there were any changes, she stated that Brown never held either bag.[4] A juror attempted to ascertain what happened with Shela that led Ms. Jackson to call the police, but the U. S. Attorney interrupted the question and dismissed the witness.

At a status hearing on April 14, 1972, counsel for Brown advised the court that the U.S. Attorney "did not want the defense talking to [Ms. Jackson before trial]." The U.S. Attorney replied that the witness had been threatened, although not by counsel for either appellant. He said further that Jackson's mother had sent her outside the jurisdiction to live with a relative because she was afraid. Despite persistent argument by the prosecutor, however, the court ruled that counsel were entitled to interview the witness, and discussed possible ways in which they could do so.

One week later, at a status hearing on April 21, 1972, the U.S. Attorney informed the court that he was mistaken when he stated that Jackson had left town. He suggested that she could be brought to the courthouse so counsel could interview her. The court advised counsel to get together with the U.S. Attorney and "work out a date [to interview the witness] convenient to all."

### B. *Trial*

On the opening day of trial, two months after the April 21 status hearing, counsel advised the court that none of the defense attorneys had interviewed Ms. Jackson. "If there is a question about a threat being made to any wit-

ness, I want to make sure that [defense counsel] are a long way from that scene." A U.S. Attorney other than the one who had appeared at the status hearings responded that "[defense counsel] are not to be considered as having anything to do with any possible threats to the witnesses. This is a tight community [where the witnesses and appellants live], and any threats came from the peer groups."

When Ms. Jackson was called to testify she refused to answer any questions because "it might incriminate me." The court appointed counsel to represent her, and, after a brief conference with his client, counsel informed the court that her refusal to testify was due to fear of reprisal. Thereupon, the jury was excused, and in Jackson's presence her police statement and grand jury testimony were read into the record. The U.S. Attorney then resumed questioning, still outside the presence of the jury, and the witness contradicted her former statements by claiming that Clayborne never had a bag with watches. The court advised the prosecutor to "consider the indictment for perjury," and instructed the witness that perjury is a "fifteen year penitentiary sentence." Nonetheless, Jackson refused to answer the next question, and the following colloquy ensued:

The Court: Very well. Let me tell you now what you are faced with. You are going to be faced with two contempt charges. I will leave it to the United States Attorney to prepare the necessary form for criminal contempt, and if I am not mistaken without a jury trial you can be put in jail for as much as six months. I may well hold a jury trial, which then puts—What is the maximum there?

4. The context of the testimony is a bit confused. After hearing her statement to the police read to the grand jury, Jackson and the U. S. Attorney engaged in the following conversation:

> Jackson: And where—[Clayborne] had two bags. [Brown] didn't have no bags.
> U.S. Att'y: [Clayborne] had two bags; is that correct.
> Jackson: (Nodding).

> U.S. Att'y: And he showed you the gun in one of the bags? And were there watches in the other bag?
> Jackson: (Nodding).
> U.S. Att'y: And did William have any bag at any time?
> Jackson: Uh-uh, no.
> At that point the discussion changed to a different subject.

[Counsel for Ms. Jackson]: I think a year.

The Court: . . . The second thing, without any such consuming efforts, I hold you in civil contempt and I commit you to the District of Columbia Jail until such time as you purge yourself by coming here and giving the answers here in Court. Do you understand? Take her away. She is committed to jail.

Jackson's counsel then informed the court "that she was told by some prosecutor that she would not have to testify in open court and she would not have to face the Defendants with her testimony." After a bench conference, Jackson was told by the court that she would not be placed in jail that evening; instead she and her mother would be put in protective custody by the U.S. Attorney for the night, "[b]ut I can assure you this, Miss Jackson: If you continue to refuse to testify tomorrow morning, I shall see to it that you are in jail by noon tomorrow and that you will remain there until you are willing to testify."

The following morning, before the jury was brought in, Jackson answered several questions asked by the U.S. Attorney. The court inquired if she remembered her statement to the police and her grand jury testimony, and if "your testimony today [is] going to ·be along the same line?" Counsel for Brown immediately requested a bench conference and indicated that he thought the court's question "raises a very sensitive area in that the witness, of course, should testify truthfully as to what she currently recalls happening on [the date of the shooting]." The court agreed, and said he would instruct the witness to testify "truthfully." Before he could do so, however, counsel for Clayborne moved to exclude Ms. Jackson's testimony "on the grounds that [it] is coerced and therefore inherently probable that it could not be the truth." The court responded that counsel could explore the circumstances in which she agreed to testify, and whether her testimony was coerced, on cross-examination. A discus-sion ensued in which counsel for Clayborne requested that he be allowed to interview Ms. Jackson "for two purposes": first, because the U.S. Attorney had "kept her from us during the entire length of this case", and second, "to find out what has happened since she left Court yesterday." The court asked, "[H]ow did [the U.S. Attorney] keep her from you?" Counsel replied, "[W]e didn't have her name or know where she lived." The court suggested that Clayborne certainly knew the witness's name and address, but counsel responded, "Clayborne claims not to know who the witness would have been." Brown's counsel then stated that "I was aware of who the witness was." And Clayborne's counsel followed, "[e]ven if we were remiss in not finding her all this time, we should have an opportunity to ask her— . . . We have no way of cross-examining." Clayborne's counsel then switched tactics and argued only that he should be allowed to interview the witness regarding the events of "the last 12 or 18 hours." The court granted a recess so that counsel could interview Jackson regarding the events that transpired since the close of court on the preceding day, and instructed the court reporter, counsel for Ms. Jackson, and Ms. Jackson's mother to be present.

At this conference Jackson stated that the previous night she had discussed the case with her mother who told her to "tell the truth," and that that morning she had reviewed her police statement with the U.S. Attorney. The interview concluded with the following exchange:

[Counsel for Brown]: As a result of your conversations with your mother and [the U.S. Attorney], do you feel now that you have to testify exactly the same way as you did in the statement you· made to the police and before the Grand Jury?

The Witness: Yes.

[Counsel for Brown]: Do you feel that if you don't testify the same way it will be considered perjury on your part?

The Witness: Yes.

[Counsel for Brown]: And do you feel that you, therefore, must say what you said before, even though in your own mind now you might not remember it the same way?

The Witness: Yes.

[Counsel for Brown]: So if you remember things differently, you still feel that you have to say what you said before in order not to be guilty of perjury? Is that true?

The Witness: Yes.

Based on this interview, counsel for Brown informed the court that he no longer believed that the events of the preceding day were "merely factors affecting [Ms. Jackson's] credibility as a witness, . . . [but now thought] her testimony will be so inherently incredible and untrustworthy that as a matter of law she should not be permitted to testify." The court, outside the presence of the jury, then ordered the transcript of the interview read into the record. After hearing it, he decided that he would reinstruct the witness, "out of the presence of the jury," to testify to "the truth as she knows it and nothing else." Brown's counsel asked if the court would also "state to the witness that even if she remembers things differently from what she may have remembered previously, she should say now what she remembers." The court replied, "[n]o, . . . If you think there is something on cross-examination you can properly develop, you can do so. It is not for me."

The witness was called and instructed to tell "the truth and only the truth." She testified essentially to what was in her police statement. At first, when asked if Brown was holding the bags while Clayborne was fighting with the insurance man, she said yes. Shortly thereafter, however, when asked if Brown had anything in his hands, the witness replied, "[n]o, I don't remem-

ber." The U.S. Attorney was permitted to refresh her memory by having her read her police statement. She was not, however, shown her grand jury testimony, where she stated that Brown was not holding either bag. After reading her police statement, she testified that she now remembered that Brown was holding "two bags."

After a luncheon recess, counsel for Clayborne advised the court, "[o]nce the jury comes back I am going to announce that I am not going to cross-examine this girl and I am going to ask the Court to hold her for possible leave to cross-examine her later, although I don't anticipate it. The reason I am putting this on the record now is it is a tactic on our part which we think will help the Defendant. So when the record goes upstairs—" At that point, the court interrupted, and told counsel that if he planned to cross-examine Ms. Jackson he would have to do so immediately. Counsel declined to do so. Counsel for Brown then stated that he would not cross-examine Ms. Jackson.

Another government witness testified that he had spoken with Clayborne on the day of the homicide, and had asked, "[d]id you do it?", to which Clayborne responded, "[y]es." By "it," the witness said he meant the robbery[5] of the insurance man. On cross-examination, the witness stated that he thought Clayborne was "jiving" when he claimed to have done "it," since he was laughing at the time, and that was Clayborne's manner of joking.

The only witness for the defense was Clayborne who testified that he had stayed at home on the day of the homicide. He said Jackson had visited him in jail nine or ten times, and had told him that her police statement was untrue. She said her mother had "put her up to it" because of a $5000 reward that had been offered by the insurance company.[6]

---

5. Since there had been no testimony regarding a robbery of the insurance agent, the court ordered the witness's reference to a robbery stricken from the record.

6. The insurance company had in fact offered such a reward. *See* Washington Post, May 16, 1971 at A-5 cols. 1 & 2.

## C. *Post-Trial*

Three months after trial—and five days after appellant Clayborne filed notice of his appeal—counsel for Clayborne moved to file a "Statement Concerning Counsels' Decision Not To Cross-Examine [Ms. Jackson]." The reason for this motion was:

> In the case at bar the decision to not cross-examine the key Government witness would need no explanation to experienced trial lawyers thoroughly familiar with the facts in the case. However, counsel is aware that many appellate counsel have not tried a criminal case and the fact that trial counsel did not cross-examine the only real Government witness would constitute ineffective assistance *per se*. Also, the Appellate Court, although presumably experienced trial counsel in the past, may not be sufficiently apprised of the underlying reasons why such a tactic is pursued.

The court granted this motion. The "Statement" contained the following reasons for not cross-examining:

1. To preserve counsels' position that the witness should not have been permitted to testify.

2. To preserve counsels' position that counsel should have been permitted to speak to Miss Jackson before she testified concerning her testimony.

3. The young witness had broken down twice and she presented a very sympathetic witness to the jury and a very difficult witness for any counsel to cross-examine.

4. Miss Jackson's direct testimony did not give a factual basis to support a charge of robbery or attempted robbery necessary for a felony-murder conviction. Had Miss Jackson been permitted by way of cross-examination or by a leading re-direct question to explain fully what allegedly occurred between the deceased and the defendant, James Clayborne, evidence of an attempted robbery most certainly would have come out.

5. Had Miss Jackson been permitted to explain in detail the manner in which the deceased had been allegedly shot by Mr. Clayborne there could well have been sufficient evidence to support the element of premeditation as a part of First Degree Murder.

6. Mr. Clayborne's defense could be presented without the cross-examination of Miss Jackson. Further, Mr. Clayborne's defense might well put the Government in a position requiring it to recall Miss Jackson in rebuttal to discredit Mr. Clayborne's testimony that she was lying in order to get reward money. If that occurred counsel would then be in a position to freely cross-examine Miss Jackson without the fear of a First Degree conviction.

Appellants contend: (A) that their counsels' failure to cross-examine Ms. Jackson was the product of inadequate investigation and preparation; and (B) that they were substantially prejudiced as a result since Miss Jackson was the only witness of consequence, and she could have been significantly impeached if not rendered wholly incredible. Therefore, appellants argue, they were denied their sixth amendment rights to the effective assistance of counsel.

### A

In anticipation of a claim of ineffectiveness, Clayborne's counsel[7] filed a "Statement" in the record below to advise this court that their decision not to cross-examine Ms. Jackson was a trial "tactic."[8] Appellate counsel (who was

---

7. Counsel for Brown did not join this "Statement." However, at the close of the "Statement", Clayborne's counsel indicated that "[a]ll four defense counsel felt that the tactic not to cross-examine Miss Jackson prevented a First Degree conviction." Thus, although we do not have an explicit statement from Brown's counsel as to why they did not cross-examine, it appears that the reasons are similar to those offered by Clayborne's counsel. Moreover, since the case against Brown was weak, and since Ms. Jackson could have been significantly impeached by her grand jury statement, the need to cross-examine her was that much greater for Brown's counsel than it was for Clayborne's counsel.

8. At trial, Clayborne's counsel explained that he was not cross-examining Ms. Jackson because "it is a tactic on our part which we think will help the Defendant."

not trial counsel) flatly asserts that trial counsel did not, and indeed could not, cross-examine the witness because they neither interviewed her before trial, nor adequately researched the legal questions at issue. In United States v. De-Coster, 159 U.S.App.D.C. 326, 487 F.2d 1197, 1201 (1973), we stated:

> This court does not sit to second guess strategic and tactical choices made by trial counsel. However, *when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.* (Emphasis supplied.)

To insure "adequate preparation," we delineated certain specific duties owed by counsel to his client, including "interview[ing] not only his own witnesses but also *those that the government intends to call*," and doing *"adequate legal research."* In enumerating these obligations, we did not announce new standards for trial counsel,[9] but simply brought together a check list of responsibilities heretofore required, depending, of course, on the circumstances of a given case.[10] Indeed, in the present case, the court and defense counsel all agreed that counsel would attempt to interview this witness. And despite strenuous objections by the prosecution, the court insisted that she be made available to the defense.

The failure of counsel to interview Ms. Jackson and to do adequate research lays behind five of the six proffered reasons for not cross-examining her.[11] Two of the five reasons rested on *counsels'* fears that the testimony elicited would provide evidence either of a robbery or premeditation, and thereby subject appellants to a first degree murder conviction. Counsel did not act to determine whether these fears were justified. Because they failed to interview Ms. Jackson,[12] they were compelled to proceed on their bare speculation as to what she would reveal on cross-examination. Where important information is available to diligent counsel, such speculation is hardly an acceptable substitute.

Counsel also claim that they did not cross-examine because they wanted to preserve their positions taken at trial that Ms. Jackson should not have been allowed to testify at all, or that counsel were entitled to interview her before she testified about matters other than what transpired while she was in protective custody. These reasons were predicated upon an erroneous understanding of the governing case law. Once the court ruled against counsel, they were entitled to do what they "fairly could to limit the prejudicial impact of the[se] ruling[s]," without waiving any appeal with respect to the initial objections.[13]

Counsel's final reason for not cross-examining was that Clayborne's defense

---

9. To my knowledge, no member of this court has ever even suggested that "obtaining a complete acquittal . . . be the measure of a defense lawyer's . . . effectiveness [in Sixth Amendment cases]." Majority Opinion at p. 478. Rather, we—and the Constitution—demand simply that all defendants be given "the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." United States v. DeCoster, 487 F.2d 1197, 1202 (1973).

10. *See, e. g.,* United States v. Hammonds, 138 U.S.App.D.C. 166, 425 F.2d 597 (1970); Matthews v. United States, 145 U.S.App.D.C. 323, 449 F.2d 985 (1971); United States v. Thompson, 154 U.S.App.D.C. 347, 475 F.2d 931 (1973); United States v. Benn, 155 U.S.App. D.C. 180, 476 F.2d 1127, 1132–1135 (1973) (opinion of Bazelon, C. J.).

11. The only offered reason not directly dependent on counsel's lack of preparation was that Ms. Jackson was a sympathetic witness and that therefore cross-examination might alienate the jury.

12. The conversations that Jackson may have had with Clayborne while he was in jail, page 486, *supra,* cannot be regarded as substitutes for comprehensive interviews conducted by counsel. Indeed, if, as Clayborne testified, Jackson told him that she had lied to the police, the need for an interview would seem even more compelling.

13. United States v. Maynard, 155 U.S.App. D.C. 223, 476 F.2d 1170, 1175 (1973).

could be presented without their doing so. This naked conclusion, however, seems highly untenable since appellant's whole defense appeared to rest on destroying Ms. Jackson's credibility.

Counsel's own "Statement", then, makes it abundantly clear that their decision not to cross-examine Ms. Jackson was uninformed because of a failure to adequately research or investigate their case. Indeed, Clayborne's attorney admitted as much when he told the court that, having failed to interview the witness, "[w]e have no way to cross-examine [her]." [14]

### B

Appellants further contend that they were greatly prejudiced by counsel's failure to engage in cross-examination. Ms. Jackson was a critical witness and might have been severely impeached on several grounds:

1) Counsel could have brought out the fact that the witness agreed to testify only after she was threatened with a contempt citation and an indictment for perjury. By her own admission, Jackson indicated that she felt compelled to testify "exactly the same way as [she] did in the statement [she] made to the police and before the Grand Jury . . . even though in her own mind now [she] might not remember it the same way."

2) Counsel could have inquired if the witness knew about a published reward of $5000,[15] and whether the reward influenced the witness or her mother, as Clayborne claimed Jackson told him it had done.

3) Counsel could have asked about Jackson's assertion to the police, alluded to before the grand jury, that she called the police because she was "mad with Shela," Clayborne's girlfriend.

4) Counsel for Brown could have impeached the witness with her grand jury testimony to the effect that Brown was not holding "any bag at any time." This evidence was particularly crucial since Jackson vacillated on this point on direct examination, and only stated that Brown was holding the bags *after* reading her police statement. Moreover, the government's case against Brown was weak, and turned largely upon the evidence that he held the bags while Clayborne assaulted the insurance agent.[16]

Prior to *DeCoster, supra,* an appellant was required to show that counsel's failure to meet his obligations "blotted out the essence of a substantial defense."[17] However, in *DeCoster,* recently held retroactive in United States v. Butler,[18] we held that once an appellant shows a violation of the "precepts" delineated therein, the *government* must prove "lack of prejudice."[19] There has been no such showing. Indeed, appellants have clearly satisfied any reasonable view of even their pre-*DeCoster* burden. They rely on significant matters which might have seriously undercut the witness's credibility. And there may well have been other

---

14. *See* McCormick, Evidence § 30 (1954) ("preparation before trial is the only soil from which, in the day-to-day run of cases, successful cross-examination can grow.").

15. Failure to introduce evidence of the reward resulted in the following interruption of Clayborne's closing argument:

> Counsel: . . . Meanwhile the insurance company puts up a reward—
> The court: I never heard any evidence on this. Disregard that, ladies and gentlemen. There is no evidence in this case anybody put up any reward.

Evidence of a reward "may affect the credibility of a witness for the prosecution." 3A

Wigmore § 969 (Chadbourn rev. 1970). *See* Wheeler v. United States, 351 F.2d 946 (1st Cir. 1955); Harris v. United States, 83 U.S. App.D.C. 348, 169 F.2d 887 (1948).

16. *Compare* Bailey v. United States, 135 U.S. App.D.C. 95, 416 F.2d 1110 (1969). *See* note 2 *supra.*

17. *See* Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968).

18. United States v. Butler, 504 F.2d 220 at 223 n. 11 (August 30, 1974) at 6 n. 11.

19. United States v. DeCoster, *supra* 487 F.2d at 1204.

such factors that we do not know of precisely because counsel neither interviewed nor cross-examined the witness.[20] On the other hand, the justifications provided by counsel for not cross-examining, with one exception, are traceable to inadequate research or speculation necessitated by the failure to interview the witness. In short, appellants have demonstrated that counsels' inadequacies either "blot[ted] out" their *sole* defense, or prejudiced their ability to show that their defense was blotted out.[21] No more can be required under the most stringent test.

---

20. One of the reasons for requiring the government to show lack of prejudice from counsel's *ineffectiveness is that "proof of* prejudice may well be absent from the record precisely because counsel has been ineffective." United States v. DeCoster, *supra* at 1204.

21. *Compare* Matthews v. United States, 145 U.S.App.D.C. 323, 449 F.2d 985 (1971) ("counsel for [appellant's] co-defendant did conduct cross-examination in a manner which inured substantially to the benefit of [appellant]. This we think afforded effective assistance of counsel insofar as it depended on cross-examination.").