Alice SCOTT, Appellant,

v.

UNITED STATES, Appellee.

Phillip N. SCOTT, Appellant,

v.

UNITED STATES, Appellee.

Nos. 90–CF–529, 90–CF–603.

District of Columbia Court of Appeals.

Argued June 18, 1992.
Decided Jan. 26, 1993.

918

Paul H. Zukerberg, Washington, DC, appointed by this court, for appellant Alice Scott.

Richard Seligman, Washington, DC, appointed by this court, for appellant Phillip Scott.

Stephen P. Anthony, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Clifford R. Cronk, III, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY, STEADMAN and WAGNER, Associate Judges.

TERRY, Associate Judge:

Appellants, who are mother and son, were both convicted on three counts of armed robbery,[1] and appellant Phillip Scott was also convicted of carrying a pistol without a license.[2] Phillip Scott now argues that his convictions should be reversed because the trial court refused to admit into evidence certain police reports, because the trial court failed to conduct a sufficient inquiry into his complaints about the performance of his counsel, and because the prosecutor engaged in improper conduct in the course of cross-examining him and in closing argument. Alice Scott contends that the trial court erred in permitting one of the victims to identify her in court and in denying her motion for severance based on an asserted disparity of evidence. She also joins in some of Phillip Scott's arguments concerning the prosecutor's cross-examination. We agree that the conduct of the prosecutor was improper in at least three instances, but we are persuaded that it does not require reversal. Since we find no other error, we affirm the convictions of both appellants.

## I. FACTS

In the early morning hours of January 6, 1989, Kathleen Beall, Cameron Boswell, and Lisa Holmes were working at the River Club, a restaurant and night club in the Georgetown section of Washington. At about 2:00 a.m., as the club was closing for the night, Alice Scott came in and asked for "the Burton party." Both Beall and Boswell remembered her quite well because the club was closing and no customers were left in it, and because Scott was "completely underdressed" compared with the River Club's usual clientele.[3] The manager told Mrs. Scott that the club was closed and escorted her out the side entrance.

A few minutes later, Beall, Boswell, and Holmes left the River Club together and walked to Holmes' car.[4] When they reached the car, Alice Scott, who was sitting in another parked car nearby, called out to them, asking directions to George Washington University Hospital. Holmes and Boswell by this time had entered the car, but Beall was still standing next to the right rear door, so she gave the requested directions. Almost immediately a man got out of the other car and started running toward the three women. This man, Phillip Scott, pushed Beall into the car, pulled a gun out of his pocket, and ran around to the left rear door and got into the car. Phillip Scott demanded the car keys from Holmes and then, with Alice Scott's help, proceeded to rob the three women of their jewelry as well as a camera bag and its contents—a camera with a flash attachment—belonging to Beall. During the robbery, Phillip Scott pointed the gun, described by Boswell as a revolver, at each of the three victims (Boswell testified that he held the gun "right at my temple") and warned them not to look at him.

When the robbers started running back to their car, Beall got out of the back seat and yelled, "Stop, we've been robbed, call the police." Phillip Scott turned and fired his gun once in Beall's direction, but the

---

1. D.C.Code §§ 22–2901, 22–3202 (1989).

2. D.C.Code § 22–3204(a) (1989).

3. Beall testified that "she shouldn't have been let in the front door," but at that late hour there was no doorman.

4. Holmes had agreed to give the others a ride home.

bullet missed her. The robbers then drove off, throwing Holmes' car keys into the street as they fled. The victims returned to the River Club and called the police.

Both appellants were then living in a rooming house in Mount Rainier, Maryland, a suburb of Washington. In early February, about a month after the robbery, Phillip Scott attempted to pawn the items stolen from Kathleen Beall in order to pay rent to Donald Barkley, his landlord. Scott told Barkley he could pay the rent if Barkley would give him a ride to a pawn shop. Barkley arranged for a friend to drive them both there, and Scott went into the pawn shop with a leather bag, a camera, and a flash attachment.[5] Scott was unable to complete the pawn transaction, however, because he had no identification with his photograph on it, so Barkley agreed to pawn the items for him. When Barkley asked Scott whether these items belonged to him, Scott replied that they did. Maryland police received a routine copy of the record of the pawn transaction, and they in turn notified Detective Howard Blum of the Metropolitan Police that property reported as stolen in the District of Columbia had been pawned.[6]

Blum's investigation led him to suspect that Alice and Phillip Scott had been involved in the robbery at the River Club, so he arranged to have the three victims view two arrays of nine photographs each—one of men and one of women—in March 1989. Kathleen Beall was unable to identify either of the robbers from these photographs, but Cameron Boswell and Lisa Holmes both identified Alice Scott from one of the photographs as the woman who had robbed them. Holmes, in addition, identified Phillip Scott from a photograph as the male robber. On June 12, about three months later, all three victims went to police headquarters to attend a lineup of

women. Viewing the lineup separately, both Beall and Boswell identified Alice Scott. Holmes "couldn't decide" between two of the women in the lineup—Alice Scott and another—and in the end she selected the other woman "because of the hair."[7] At trial, however, when Ms. Holmes was shown a photograph of the lineup, she identified Alice Scott from that photograph as the female robber. All three victims identified Alice Scott in open court. Beall and Holmes identified Phillip Scott as well, but Boswell did not, explaining that she had only looked at the male robber "for a few seconds when I turned around to give him my ring." Ms. Boswell did testify, however, that she had seen Phillip Scott at an earlier hearing in the case, and that he was then wearing "the same jacket he was wearing the night I was robbed."

Alice Scott filed a motion to suppress all identification testimony. Lisa Holmes testified at the hearing on that motion that she had been told by either Detective Blum or an Assistant United States Attorney at the lineup that the woman she had identified was "not the right one." She also learned that Beall and Boswell had identified someone else, but she was not told who that person was. The trial court found that this notification was "somewhat suggestive," but it denied the suppression motion on the ground that Holmes had made a reliable identification of Alice Scott from the photographic array before being informed that she had picked the wrong person in the lineup.

## II. PHILLIP SCOTT'S CONTENTIONS

### A. *The refusal to admit certain police reports*

■ Phillip Scott maintains that the trial court erred in refusing to admit into evi-

---

5. Barkley testified that he had seen Scott bring these items from his room just before the trip to the pawn shop.

6. Ms. Beall's stolen flash unit had a serial number, which she had given to the police after the robbery. The serial number of the pawned flash unit matched that of the one that had been reported stolen.

7. Ms. Holmes testified that she had difficulty identifying Alice Scott at the lineup because her hair style on that occasion was different from that of the robber. Holmes also admitted that she was "nervous" when she viewed the lineup. Ms. Boswell testified that when she saw Alice Scott in the lineup, "her hair was different, but I recognized her face."

dence several police reports that contained descriptions of his appearance and clothing on the night of the robbery. He asserts that these documents were prior inconsistent statements by Beall and Boswell that were "successfully used on cross-examination." We hold that the trial court committed no error because the police reports did not clearly impeach any government witness and because, in any event, the defense failed to lay a proper foundation for their admission.

Scott contends, in particular, that the police reports contained information which contradicted testimony by both Beall and Boswell describing his clothing and skin tone. Beall testified that soon after the robbery Officer Minnie Holden interviewed all three victims, and that Beall described the male robber as being darker than the female robber, "but not dark-skinned." Beall also said that she told Officer Holden that the male robber was wearing a black leather jacket with an embossed pattern and a black fur collar. Boswell testified that the description she gave to Officer Holden of the male robber's clothing included a black leather coat with a fur collar. Officer Holden later testified and was questioned about certain information on the police reports she had prepared, including a Form PD–251. Holden had written on the PD–251 that the male robber wore a "black jacket" and that he had a "dark" skin tone. On cross-examination, however, Holden said that she did not consider Phillip Scott to have dark skin. She described him as "light" skinned.

Phillip Scott's counsel later requested that Officer Holden's reports (the PD–251 and other descriptions of the robbers) be admitted into evidence because they contained prior inconsistent statements impeaching the testimony of two government witnesses, Beall and Boswell. The trial court denied the request, however, on the ground that no impeachment had occurred.

We affirm the court's exclusion of the proffered documents on two grounds. First, it is not at all clear that the information contained in Officer Holden's reports actually impeached the testimony of any government witness. *See McClain v. United States,* 460 A.2d 562, 568 (D.C. 1983) (trial court properly excluded a police report sought to be admitted for impeachment because the report "was not necessarily inconsistent" with the witness' testimony). The notation in the PD–251 that the male robber wore a "black jacket" did not contradict the testimony of Beall and Boswell that he wore a black leather jacket. As for the fur collar, Officer Holden testified, "I don't recall hearing fur." Likewise, with respect to Scott's skin tone, Officer Holden testified that she would "consider him light." Thus it was Officer Holden's testimony, not anything in the PD–251 (or any other report), that contradicted the testimony of Beall and Boswell about the fur collar. There being no impeaching material in the police reports, we find no error in their exclusion.

■ Moreover, Scott did not lay the requisite foundation for the admission of materials used to impeach a witness. A party seeking admission of a witness' prior inconsistent statement must first confront that witness with the prior statement and give her an opportunity to explain it. *McClain v. United States, supra,* 460 A.2d at 568–569; *United States v. Wright,* 160 U.S.App.D.C. 57, 63, 489 F.2d 1181, 1187 (1973). Because Scott's counsel failed to confront either Beall or Boswell with the information contained in the police reports, we hold that she failed to lay a foundation for their admission.[8]

---

8. Even if we assume, for the sake of argument, that counsel did lay a proper foundation and that the police reports did contain prior inconsistent statements of the two witnesses, any error in keeping the documents from the jury was harmless because the jury was made aware through other testimony "of the existence and content of the prior statement[s]." *Jefferson v. United States,* 328 A.2d 85, 86 (D.C.1974); *see*

*Reed v. United States,* 403 A.2d 725, 729 (D.C. 1979). Officer Holden testified extensively about the contents of the police reports. Any inconsistencies between the testimony of Beall and Boswell and their descriptions of the male robber, as recorded by Officer Holden, were fully aired before the jury. On this record we can find no prejudice to the defense.

## B. *Ineffective assistance of counsel*

Phillip Scott claims that the trial court "failed to conduct an adequate inquiry into [his] claims of ineffective assistance of counsel as required" by *Monroe v. United States*, 389 A.2d 811 (D.C.), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States*, 391 A.2d 755 (D.C.1978). He urges us to reverse his convictions, or at least to remand the case for a hearing on his ineffective assistance claim. We find no basis for either reversal or remand on this ground.

■ We conclude, first of all, that *Monroe* and *Farrell* do not even apply to this case. In *Nelson v. United States*, 601 A.2d 582, 591 n. 26 (D.C.1991), in reviewing a defendant's complaint to the trial judge at the outset of trial about his attorney, we said that the *Monroe–Farrell* standard of review was applicable "[b]ecause the jury had not been sworn and jeopardy had not yet attached...." We hold today that the converse of that principle is equally true: once jeopardy attaches, *Monroe* and *Farrell* are no longer applicable.

In *Monroe* we held that when a defendant, *before trial*, claims ineffective assistance of counsel based on counsel's lack of investigation, preparation, "or other substantial reason," a trial court must "conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." ... "The requirement of an 'inquiry' in such circumstances, which has come to be called a '*Monroe–Farrell* hearing,' has been reaffirmed by this court on numerous occasions."

*Nelson, supra*, 601 A.2d at 591–592 (citations omitted and emphasis added); *accord, e.g., Gordon v. United States*, 582 A.2d 944 (D.C.1990) (when defense counsel advised the trial court "prior to trial" that defendant was "upset with counsel," *id.* at 945, this court reviewed the trial court's inquiry under *Monroe–Farrell* standards). As we explained in *Monroe*, the factors to be weighed by the court in assessing a pre-

trial claim of ineffective assistance are different from those which relate to the more usual post-trial claims, and the remedy for counsel's shortcomings is likely to be different as well. *See* 389 A.2d at 818–819. Thus the applicability *vel non* of the *Monroe–Farrell* test is the first issue to be resolved. In this case, because the jury was sworn (and jeopardy attached) on January 30 but Scott's complaint was not voiced until the morning of January 31,[9] we hold that *Monroe* and *Farrell* have no bearing on this case.

The standard of review applicable to Phillip Scott's claim of ineffective assistance of counsel is the more familiar two-part test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which this court adopted in *White v. United States*, 484 A.2d 553, 558 (D.C.1984):

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland, supra*, 466 U.S. at 687, 104 S.Ct. at 2064. The Court went on to define what it meant by prejudice:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068. Finally, the Court recognized "a strong presumption," which the defendant must overcome, "that counsel's conduct falls within the wide range of reasonable professional assistance...." *Id.* at 689, 104 S.Ct. at 2065.

■ Phillip Scott has three specific complaints about his trial counsel's performance: (1) that counsel "failed to proffer

---

9. Scott again complained about his counsel's performance on February 5, the third day of trial. On both occasions the court interrupted

the trial and inquired into the matter, satisfying itself that Scott had not been deprived of his right to the effective assistance of counsel.

that the exhibits she attempted to introduce as evidence of impeachment were also independently admissible under the prior identification exception to the hearsay rule"; (2) that counsel failed to make an opening statement; and (3) that counsel unwisely permitted him to testify, thereby opening him up to impeachment with six prior convictions. While it is apparent from the record that Scott and his counsel did not communicate well, we cannot discern any undue prejudice attributable to counsel's supposed failings. We hold that Scott's claim of ineffective assistance does not pass the *Strickland* test.

Scott's first two complaints involve nothing more than trial tactics. We have repeatedly held, both before and after *Strickland*, that "[m]ere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985) (citation omitted); *accord, e.g., Woody v. United States*, 369 A.2d 592, 594 (D.C.1977) (rejecting claim of ineffective assistance based on "a variety of tactical decisions and omissions by trial counsel which cannot be considered to have resulted in a constitutional infirmity"); *see also United States v. Clayborne*, 166 U.S.App.D.C. 140, 146, 509 F.2d 473, 479 (1974) ("reversal should never be based upon the good faith tactics of defense lawyers except upon the clearest proof of actual prejudice"). With the benefit of hindsight, one could perhaps argue for the admission of the police reports as substantive evidence under the prior identification exception to the hearsay rule. *See Morris v. United States*, 389 A.2d 1346, 1351 (D.C.1978). But the substance of the reports was placed before the jury through counsel's cross-examination of Officer Holden. We see no prejudice resulting from the fact

that the actual reports were not in evidence. As for counsel's failure to make an opening statement, Scott points to no identifiable prejudice flowing from that failure. Many attorneys, for many reasons, from time to time omit an opening statement in a trial. We find no prejudice, and hence no basis for reversal, in counsel's decision to do so in this case.

■ Scott's third claim of ineffective assistance is that his trial attorney erred by permitting him to testify and thus to be cross-examined about several prior convictions. This argument is misconceived because it erroneously assumes that defense counsel has the power to decide whether to put a defendant on the stand. Counsel may advise and recommend, but when the crucial moment comes, it is up to the defendant alone to decide to testify or not to testify. This court, like "the vast majority of other federal and state courts,"[10] has made clear that "the defendant's right to testify is a fundamental and personal right which can be waived only by the defendant." *Boyd v. United States*, 586 A.2d 670, 674 (D.C.1991). For this reason we reject Phillip Scott's claim that his trial counsel rendered ineffective assistance by "permitting" him to take the stand.

### C. *Improper conduct by the prosecutor*

Phillip Scott claims that the prosecutor made several statements during cross-examination and closing argument which were so improper that the trial court should have immediately intervened and taken corrective action, and that the failure of the court to do so requires reversal of his convictions. *See McGrier v. United States*, 597 A.2d 36, 40 (D.C.1991); *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989). We agree that the prosecutor[11] exceeded

**10.** *See, e.g., United States v. Teague*, 953 F.2d 1525, 1532–1533 (11th Cir.) (en banc), *cert. denied*, — U.S. —, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992); *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir.1987); *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir.1984), *cert. denied*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986); *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 118–119 (3d Cir.1977); *Winters v. Cook*, 489 F.2d 174, 178–179 (5th Cir.1973). *See also Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308,

3312, 77 L.Ed.2d 987 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, *testify in his or her own behalf*, or take an appeal" (emphasis added)).

**11.** The government is represented by different counsel on appeal.

the bounds of propriety on more than one occasion. We hold, however, that none of his transgressions, either singly or in combination, were sufficient to warrant reversal.

The standard of review applicable to claims of improper comments by a prosecutor has, unfortunately, been often repeated by this court:

> First, we must determine whether any of the challenged comments by the prosecutor were improper.... If we conclude that they were, we must then, viewing the remarks in context, consider the gravity of the impropriety, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case.
>
> If we find that a particular comment was improper, and if the issue of impropriety was properly preserved for appellate review, we will nevertheless affirm the conviction unless the defendant suffered substantial prejudice as a result.

*McGrier v. United States, supra,* 597 A.2d at 41 (citations and internal punctuation omitted). The test for determining "substantial prejudice" is

> whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

*Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969), quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Guided by these precepts, we turn to Scott's several claims of impropriety.

■ *First,* Scott complains about the prosecutor's allegedly "argumentative" cross-examination. In the course of cross-examining Phillip Scott, the prosecutor asked:

> Q. Was your plan to rob the River Club and not the patrons of the River Club? Is that what you were going to do?
>
> A. No, sir.
>
> Q. Then when you found out it was closed and they were locking the front door, you couldn't rob it any more; is that what happened?
>
> A. No, sir.
>
> Q. Maybe you were going to rob some of the patrons as they were coming out because you thought they'd be too drunk to recognize you?

Phillip Scott's attorney objected at this point, and the trial court responded, "It's cross-examination, he's got pretty wide latitude." Then, turning to the prosecutor, the court said, "You're getting pretty close to the bounds of that latitude." Thus admonished, the prosecutor did not repeat the last question, and Scott did not answer it.

Although we agree with the trial court that the prosecutor was "getting pretty close to the bounds," we find no basis for reversal here because the prosecutor framed the questions by drawing inferences from earlier testimony by the government witnesses. A prosecutor "is entitled to ... draw such inferences from the testimony as will support his theory of the case." *Tuckson v. United States,* 364 A.2d 138, 142 (D.C.1976); *accord, e.g., Jones v. United States,* 512 A.2d 253, 257 (D.C. 1986). Kathleen Beall had testified earlier that just before the robbery both Phillip Scott and Alice Scott had been waiting in a parked car across the street from the River Club. In addition, there was testimony that Alice Scott had come into the River Club at approximately 2:00 a.m., a time when there were no customers left in the club, and asked whether "the Burton party" was present. Because the prosecutor's questions to Phillip Scott drew permissible inferences from this evidence, they were not improper.

■ *Second,* Scott claims that the prosecutor improperly asked him on cross-examination to comment on the credibility of an earlier witness. We have repeatedly condemned questioning by counsel which prompts one witness to suggest that he or

she is telling the truth and that contrary witnesses are lying. *See Mitchell v. United States,* 569 A.2d 177, 183 (D.C.), *cert. denied,* 498 U.S. 986, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990); *Poteat v. United States,* 559 A.2d 334, 336 (D.C.1989); *Freeman v. United States,* 495 A.2d 1183, 1187 (D.C.1985); *Carter v. United States,* 475 A.2d 1118, 1126 (D.C.1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985). We reiterate that such questioning is patently improper.[12]

In cross-examining Phillip Scott, the prosecutor asked:

> Q. Do you think it's some sort of coincidence that these victims pointed to pictures of your mother and that Lisa Holmes also pointed to pictures of you in different arrays involving the same robbery? Do you think that's a coincidence?
>
> \* \* \* \* \* \*
>
> Q. And did you think it's a coincidence that on the very same day, she [Lisa Holmes] also picked out a picture of your mother in another completely different set of photographs?

Both questions were immediately met with objections, which the trial court sustained before Mr. Scott could say anything in response. Because the questions were never answered, we do not see how Scott could have suffered any prejudice, and thus we hold that these questions provide no basis for reversal. *Cf. Mitchell v. United States, supra,* 569 A.2d at 183 (improper cross-examination by prosecutor was harmless when defendant's responses did not comment on the truthfulness of other witnesses' testimony). Nevertheless, the questions should not have been asked in the first place.

■ *Third,* Phillip Scott, joined by Alice Scott, contends that the prosecutor injected serious prejudice into the case when he asked Phillip Scott a series of questions about whether he had a revolver in his room in Mount Rainier.[13] Both appellants argue that this questioning was improper because the trial court had earlier ruled that Donald Barkley could not testify about Phillip Scott's possession of a gun at his rooming house in February 1989. Phillip Scott raises the additional claim that the prosecutor's questions were an improper reference to "other crimes" evidence, contrary to the principles set forth in *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). We agree that the prosecutor acted improperly by raising an issue that the trial court had previously excluded from the jury's consideration. Because of the trial court's prompt corrective action, however, we conclude that the prejudice was sufficiently reduced so that we need not reverse appellants' convictions.

Early in the trial appellants sought to exclude testimony by Donald Barkley that he saw a gun in Phillip Scott's possession. At a hearing outside the presence of the jury, Mr. Barkley testified that "sometime during the month of February 1989," after the visit to the pawn shop, he saw Phillip Scott with a gun in the bedroom that his mother rented from Barkley. After hearing this testimony, the court ruled that "evidence concerning the gun by Mr. Barkley" would be inadmissible because it involved an incident "too remote in time" from the date of the robbery (January 6). The court also noted that Barkley's description of the revolver would not permit the jury reasonably to infer that the gun Bark-

---

**12.** More than seven years ago, in *Freeman v. United States, supra.* we said:

> [W]e are troubled by the recurrence of this particular type of attorney misconduct. This is the fourth case in little more than a year in which we have been presented with the same claim of error. We hope it will be the last.

495 A.2d at 1188 (footnote omitted). The hope we expressed, alas, turned out to be in vain.

**13.** The exchange between the prosecutor and Phillip Scott was as follows:

> Q. You also have a gun, don't you?
>
> A. No, sir.
>
> Q. You have a revolver, don't you?
>
> A. No, sir.
>
> Q. You had it in your room?
>
> [COUNSEL FOR PHILLIP SCOTT]: Objection, your Honor.
>
> THE COURT: Well, sustained as to the form. We need a time period.
>
> Q. After this robbery took place, you had a gun at 414—
>
> [COUNSEL FOR PHILLIP SCOTT]: Objection.
>
> THE COURT: Sustained.

ley saw in the rooming house was the same gun that had been used in the robbery.

After the exchange between the prosecutor and Phillip Scott concerning the gun, both defense counsel moved at the bench for a mistrial. The court denied these motions, noting that "[t]he reference made by [the prosecutor] in his question was kind of general. It wasn't a specific time.... [The question] was okay [because] [w]e didn't get the February date out." [14]

We are greatly disturbed by the prosecutor's apparent violation of the trial court's ruling on the admissibility of evidence concerning the gun. The government argues on appeal that the prosecutor reasonably believed that the court's ruling only barred Donald Barkley's "vague and remote" testimony about seeing Phillip Scott with a gun in the rooming house. [15] There is, however, nothing in the record indicating that anyone other than Barkley ever saw Phillip Scott with a gun at that location. It is thus difficult to accept the assertion that the prosecutor committed no impropriety in pursuing this line of questioning with Phillip Scott. It does appear from the trial court's remarks that the court did not regard the questions as violating its earlier evidentiary ruling because they did not refer to "a specific time." Nevertheless, an attorney who seeks to test the limits of a judge's evidentiary ruling on a potentially prejudicial matter, as the prosecutor did

here, runs the very real risk of crossing the line into improper conduct.

Under a different set of circumstances, we might well conclude that this type of questioning amounted to prosecutorial misconduct. Reversal is not warranted here, however, because there was a prompt curative instruction and because Phillip Scott was not substantially prejudiced by the questioning. After the bench conference had ended, the trial court gave an immediate curative instruction, [16] which we presume the jury followed. *See Gray v. United States*, 589 A.2d 912, 918 (D.C.1991); *Owens v. United States, supra* note 14, 497 A.2d at 1092 n. 7; *cf. Johnson v. United States*, 610 A.2d 729, 731 (D.C.1992) (prosecutor's improper questions not plain error in light of trial court's prompt curative instruction). Moreover, the three victims testified that they saw Phillip Scott with a gun in his hand, and that he used it during the robbery to threaten them and, later, to fire at one of them. In light of this evidence of Scott's possession and use of a gun during the robbery, it is very doubtful that he was unduly prejudiced by the prosecutor's improper questioning about his possession of a gun a month later.

We also reject Phillip Scott's claim that this cross-examination was an improper reference to other crimes evidence, in viola-

---

**14.** Alice Scott also claims that she was prejudiced by the prosecutor's cross-examination because "[t]he jury must have been aware that the bench colloquy concerned the discovery of a gun." This claim is too speculative to consider. We agree with the trial court's observation that "it presumes a lot to assume the jury knows or even tries to know exactly what's going on up here [at the bench]." Moreover, the court gave a cautionary instruction immediately after the bench conference, and absent any indication in the record to the contrary, we may presume that the jury followed that instruction. *See Owens v. United States*, 497 A.2d 1086, 1092 n. 7 (D.C. 1985), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986).

**15.** The actual ruling was as follows:
We're talking about a period based on his best guess, about a month, month and a half after the incident actually occurred. And his description of the gun is not such that it leads me to believe a jury could reasonably con-

clude or necessarily conclude that he's talking about the same gun that was used in the robbery.... So I would not allow the admission of the testimony concerning the gun that Mr. Barkley saw on that day. I guess I'd only ask that the Government admonish Mr. Barkley to make sure that that evidence does not come out, at least during direct testimony. Clearly, if the defense opens the door and the Government thinks that has happened, I would ask the Government to approach before you pose any questions of that sort.

**16.** The court told the jury:
Ladies and gentlemen, I want to emphasize to you that statements of counsel, questions of counsel are not evidence. And the only evidence you actually are hearing and the only thing that should matter in your deliberations is what you hear the witnesses say and what the exhibits actually say, what you conclude the exhibits actually show.

tion of the *Drew* doctrine, because the mere possession of a gun is not a "bad act." *See Jones v. United States*, 477 A.2d 231, 237–238 (D.C.1984) ("Possession of a gun, without more, is not wrongful conduct ... and the *Drew* analysis is not used where circumstantial evidence 'could not be characterized as establishing criminal behavior'") (citations omitted); *Fornah v. United States*, 460 A.2d 556, 562 (D.C. 1983); *see also King v. United States*, 618 A.2d 727, 730 (D.C.1993) (evidence that defendant possessed a pistol two weeks after charged offense was admissible if it was "directly relevant to some issue in the case"; *Drew* standards not applicable in deciding admissibility); *Wheeler v. United States*, 470 A.2d 761, 769 (D.C.1983) (*Drew* does not apply to acts that are not at least "minimally in the nature of a criminal offense").

■ *Fourth,* Phillip Scott claims that the prosecutor crossed the line of propriety when he said in his closing argument that Donald Barkley "was open and up front and honest when he testified in this case to those things that had been transgressions in his life." This comment provoked an immediate objection from Phillip Scott's attorney. The court sustained the objection and promptly gave a corrective instruction.[17] We hold that the prosecutor's comment was improper because it was his personal opinion about the veracity of a witness. "It is for the jury to decide whether a witness is truthful, and an attorney may not interject personal evaluations and opinions as to a witness' veracity." *Dyson v. United States*, 418 A.2d 127, 130 (D.C. 1980). However, this prosecutorial error clearly did not cause Phillip Scott "substantial prejudice" in light of the strength of the government's case [18] and the trial court's curative instruction. *McGrier v. United States, supra,* 597 A.2d at 41.

■ *Fifth,* Scott claims he was prejudiced by remarks the prosecutor made about the absence of shell casings at the robbery scene. In his rebuttal argument the prosecutor said:

First of all, I'll start with [the argument of Phillip Scott's attorney]. She wants to know why there's no shell casings produced here. Ladies and gentlemen, what the testimony in this case is that a revolver was used [*sic*]. A revolver is loaded in a cylinder. The witnesses identified the gun as a revolver. Revolvers do not eject shells.

Phillip Scott's attorney immediately objected, and the court sustained the objection and told the jury to "disregard the last remark by counsel."

"It is improper for an attorney to make an argument to the jury based on facts not in evidence or not reasonably inferable from the evidence." *Morrison v. United States*, 547 A.2d 996, 999 (D.C.1988) (citations omitted). In this case there was testimony from Cameron Boswell that the gun Phillip Scott used during the robbery was a revolver with a silver cylinder. However, the prosecutor's statement that revolvers do not eject shell casings clearly was not based on any facts in evidence. We need not decide whether the non-ejection of shells from revolvers is a matter of common knowledge because, even if it is not, we do not see how this remark could have been substantially prejudicial in light of the strong evidence of Phillip Scott's guilt. As the government says in its brief, "[i]f the prosecutor's remark crossed the line, it did not cross it far...." Moreover, the prosecutor's remark can be justified to some

---

17. The trial court told the jury:
   [T]he only thing that matters in this case with regard to the testimony evidence [*sic*] is what you've heard from the stand. Expressions of personal belief or an opinion by an attorney is not to be considered by you during your deliberations. It's very important that you keep that in mind.

18. In addition to the photographic identification by Lisa Holmes, Phillip Scott was identified in court as the male robber by two of the three robbery victims. The third victim, Cameron Boswell, could not identify him in person because she had not gotten a good look at the robber's face, but she did testify that the coat Scott was wearing at an earlier court appearance was the same coat that the robber wore. In addition, the evidence about the pawning of Kathleen Beall's stolen camera and flash attachment was strong circumstantial proof of Phillip Scott's involvement in the robbery.

extent under the "invited response" doctrine. *See United States v. Young*, 470 U.S. 1, 11–14, 105 S.Ct. 1038, 1044–1045, 84 L.Ed.2d 1 (1985).

■ *Sixth*, Scott asserts that the prosecutor improperly argued "consciousness of guilt" during his closing argument by making a reference to Scott's leather jacket. Kathleen Beall and Cameron Boswell both testified that they saw Phillip Scott at the pre-trial suppression hearing wearing the same black leather jacket he had worn on the night of the robbery. Scott himself testified that he had worn "a black jacket" to court on that day. During his rebuttal argument, the prosecutor made the following statement:

> [Counsel] says that Officer Holden, there's nothing in her reports that says black leather jacket. No, all the reports say black jacket, black jacket. The defendant himself says, "Yes, I have a black jacket with fur lining, yes, it's leather, yes, I brought it to court one day." But he never brought it back, did he?

Phillip Scott's attorney immediately objected to this comment. The trial court sustained the objection and instructed the jury that "the arguments of counsel are not evidence."

This statement is subject to challenge because there was no evidence that Scott's change of clothing meant anything more than that he had two jackets. But the fact that two witnesses testified that they recognized the black jacket when they saw it on Scott in the courtroom at least permitted the jury to draw an inference—a very weak one—that his wearing a different jacket thereafter "reflect[ed] an awareness of guilt." *United States v. McKinley*, 158 U.S.App.D.C. 280, 282, 485 F.2d 1059, 1061 (1973); *see also District of Columbia v. M.M.*, 407 A.2d 698, 700 (D.C.1979) (robbery suspects who switched their jackets while being driven in a police car to a showup

"thereby evidenc[ed] guilt"); *United States v. Perkins*, 937 F.2d 1397, 1403 (9th Cir.1991) (evidence that defendant cut his hair, shaved off facial hair, or changed his hair color shortly after commission of crime may be considered by jury "as evidence of consciousness of guilt"); CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.45 (3d ed. 1978).[19] In this context, the prosecutor's statement about Phillip Scott's leather jacket does not warrant reversal.

■ *Seventh*, Phillip Scott claims that the prosecutor made an improper comment when he described the defense theory of Alice Scott as "absolutely ludicrous." This claim has no merit. In the first place, Phillip Scott cannot claim prejudice from comments that were directed at his co-defendant's attorney, at least not without some showing (which he has not made) of some "prejudicial spillover" affecting his defense. *Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991). Moreover, the prosecutor's remark, though rather ill-mannered, was not improper. Such a comment on a defendant's theory of defense "is not error when it is a logical inference from the evidence, and not merely the prosecutor's personal opinion as to [the defendant's] veracity." *Hammill v. United States*, 498 A.2d 551, 557 (D.C.1985); *see Beynum v. United States*, 480 A.2d 698, 710 (D.C. 1984) (prosecutor's comments that defense theory was "silly" and "outlandish" were not substantially prejudicial because "they were conclusions offered by the prosecutor after reviewing the evidence adduced at trial"). The prosecutor here was reacting to an argument by Alice Scott's attorney which implied that Detective Blum "brainwashed [the three victims] into selecting the right person." The prosecutor's conclusion that this defense theory was "ludicrous" was a logical inference from the evidence, which showed only that Lisa Holmes had been informed *after the lineup* by either Detective Blum or an Assis-

---

**19.** Instruction No. 2.45 states in part:

   An attempt to ... change his appearance by a defendant, after a crime has been committed, does not create a presumption of guilt.... You may consider evidence of such

attempt to ... change his appearance, however, as tending to prove the defendant's consciousness of guilty.... You are not required to do so.

tant United States Attorney that she had identified the "wrong" person. Beyond that, there was no evidence that Detective Blum influenced the selections in either the photographic array or the lineup in any way.

■ *Eighth*, Phillip Scott asserts that the prosecutor misstated the law on hearsay during his rebuttal argument. The challenged comment was as follows:

> He [counsel for Alice Scott] also tells you that Lisa Holmes told you about the mother/son feeling she had. None of the other victims told you she said that. Ladies and gentlemen, Lisa Holmes said it herself. It's hearsay for Kathleen Beall to get up and say what Lisa Holmes said. It's hearsay for Cameron Boswell to get up here and say what Lisa Holmes said.

Alice Scott's attorney objected immediately and asked for a bench conference. At the bench the court overruled the objection, but the prosecutor thereafter did not return to that line of argument.

Phillip Scott now claims that Boswell and Beall could have testified to Lisa Holmes' out-of-court statement under the prior identification exception to the hearsay rule, and that the prosecutor's misstatement of the law prejudiced him. The prior identification exception permits "the admission of extra-judicial identification made prior to trial through testimony at trial of either the identifier or third parties present at the prior identification." *Morris v. United States, supra,* 389 A.2d at 1350.

Assuming *arguendo* that the prosecutor improperly misstated the law of hearsay,[20] his comment did not substantially prejudice Phillip Scott. We have said that a prosecutor's misstatement of the law constitutes "improper argument." *Hammill v. United States, supra,* 498 A.2d at 557; *see also Powell v. United States,* 455 A.2d 405, 410

(D.C.1982). But here the misstatement, if it was one, went to a minor issue in the case. Given the strength of the government's case against Phillip Scott and the peripheral nature of the issue affected by the prosecutor's comment, we can find no substantial prejudice. *McGrier v. United States, supra,* 597 A.2d at 41.

■ *Ninth* and finally, Scott asserts that the prosecutor "personalized" his explanation of the relevance of certain testimony. The government called a witness named Tracey Weiland to testify that she telephoned the police following the robbery, and to identify her voice at the beginning of the tape recording of that call. Alice Scott's attorney during his summation said, "There was an individual in this case, too, Ms. Tracey Weiland ... that the Government called. For what purposes I'm not sure." In his rebuttal argument, the prosecutor remarked that he had called Ms. Weiland as a witness "in order to get this 911 tape in because she's the first person on the tape. In order to get the tape in, I have to call the person who spoke on it." Scott now maintains that it was improper for the prosecutor "to personalize the matter by stating his legal rationale." He cites no authority for this proposition, however, and we have no reason to conclude that the remark was actually improper. We think that even if it was in some respect inappropriate, it was too trivial to worry about. *De minimis non curat lex.*

### III. ALICE SCOTT'S CONTENTIONS

#### A. *Identification evidence*

■ Alice Scott argues that her conviction should be reversed because the trial court erred in permitting Lisa Holmes to identify her in court.[21] Scott contends that because Ms. Holmes was told by an agent

---

20. The *Morris* exception may have applied here. Lisa Holmes testified that "when we got robbed, I said something to Cameron and Kathleen that I thought they were mother and son." Assuming that this statement qualified as an identification, Boswell and Beall could have testified about that remark if they in fact heard it. *See Mack v. United States,* 150 A.2d 477, 479 (D.C.

1959). Thus the prosecutor's statement to the contrary may have been incorrect.

21. Although Mrs. Scott filed a motion in the trial court to suppress all identification testimony, on appeal she does not challenge her identification by the other two victims, Kathleen Beall and Cameron Boswell.

of the government that she had chosen the wrong person in the lineup, the reliability of her in-court identification was tainted. The trial court ruled that the statement to Holmes that she picked the wrong person was "somewhat suggestive," but because she had previously made a reliable identification of Alice Scott from a photograph, it found "nothing that is overly suggestive or possibly unreliable about a possible in-trial identification." This ruling was entirely correct.

We have held that "when there has been an unequivocal, unsuggested, and otherwise constitutionally acceptable identification, subsequent identifications ... are not conducive to irreparable misidentification, in violation of due process." *Patterson v. United States,* 384 A.2d 663, 667 (D.C. 1978); *accord, United States v. Brannon,* 404 A.2d 926, 928 (D.C.1979) ("an in-court identification could not abridge [the defendant's] right to due process because the potential witness had initially identified the [defendant] at a constitutionally acceptable confrontation, despite the prosecution having later refreshed the witness' memory with a single photo prior to a hearing to suppress the showup and in-court identification"). Because the trial court found that Lisa Holmes had already identified Alice Scott in a "non-suggestive photo array," the later conversation between Lisa Holmes and the detective or prosecutor, which the court found to be "somewhat suggestive," did not require suppression of Holmes' identification.

### B. *Severance*

Alice Scott claims that the trial court erred when it denied her motion for severance on the second day of trial. She argues that severance was required because the evidence against her son and co-defendant was "far more damaging" than that against her. We find little to distinguish the amount of evidence against the two co-defendants; hence we reject Alice Scott's argument that a severance should have been granted.

▮▮▮▮ The disposition of a motion for severance is within the sound discretion of the trial court, and its ruling either way will be reversed only on a showing of an abuse of discretion. *E.g., Sousa v. United States,* 400 A.2d 1036, 1041 (D.C.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). "When ... the defendants are charged with jointly committing crimes, a strong presumption exists that they will be tried together." *Russell v. United States,* 586 A.2d 695, 698 (D.C. 1991) (citation omitted). "[A] defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him. Manifest prejudice occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants." *Bush v. United States,* 516 A.2d 186, 192 (D.C.1986) (citation omitted).

That test is not met here. Two of the three victims identified Alice Scott from a photographic array, and two picked her out of a lineup. All three victims identified her in court as the female robber, and all three described how she assisted the male robber in carrying out the robbery. On this record it cannot be said that the evidence against Alice Scott was *de minimis* in comparison with the evidence against Phillip Scott.

Alice Scott also argues that the "general principle requiring severance is heightened" by the family relationship between the two defendants, and that the jury's knowledge of this relationship made the "potential for spillover ... tremendous." In particular, she contends that the admission of the "other crimes" evidence about her son's possession of a gun and his involvement in the pawn transaction tainted her trial. There is no merit in this claim because the evidence of which Alice Scott complains was not other crimes evidence. *Jones v. United States, supra,* 477 A.2d at 237–238. Nor was Phillip Scott's involvement in the pawn transaction "independent of the crime charged." *Ali v. United States,* 581 A.2d 368, 375 (D.C.1990), *cert. denied,* — U.S. ——, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991). Moreover, there is no "general principle requiring severance," as

Alice Scott asserts; on the contrary, there is "a strong presumption" that persons jointly charged with committing the same crime will be tried together. *Russell v. United States, supra,* 586 A.2d at 698.

## IV

For the foregoing reasons, the convictions of both appellants are

*Affirmed.*