**Jayvan ALLEN, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 99–CF–1666.**

District of Columbia Court of Appeals.

Argued Nov. 12, 2003.

Decided Dec. 11, 2003.

Sandra K. Levick, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and WASHINGTON, Associate Judges, and FERREN, Senior Judge.

FARRELL, Associate Judge:

At trial, the prosecutor was allowed to cross-examine appellant repeatedly, over objection, as to whether he knew of any reason why two police officer witnesses would "lie against [him]" in their testimony. This was error, as our past decisions have made clear, and because the error was prejudicial in the circumstances of this case, we must reverse appellant's convictions for possession with intent to distribute cocaine and related weapons offenses, and remand for a new trial.

## I.

According to the government's evidence, uniformed police officers approached an apartment complex in Southeast Washington looking for Gregory Wright, possibly wanted on an arrest warrant. Officers Williams and Sullivan saw Wright, but their attention was then attracted to appellant, who was standing next to a man named Ali Sparrow. Officer Williams walked toward appellant, who had appeared fidgety and to be holding something, whereupon appellant fled together with Sparrow. Williams pursued them into an apartment building where, three or four steps behind appellant, the officer saw him throw an object to the ground as appellant ran up a flight of stairs, following Sparrow. The object was later found to be a handgun. The chase up the stairs continued until Sparrow tried unsuccessfully to open an apartment door, at which point Williams ordered both men at gunpoint to lie down. As appellant lay on the ground, he tossed a plastic bag over a railing; it was later found to contain smaller bags of cocaine. Officer Johnson, who had not seen the chase or appellant's actions, searched appellant and removed $1,635 in cash from his pocket.

Appellant's defense, supported by his own testimony and Wright's, was that if anyone had dropped drugs and a gun it was Sparrow. Thus, Wright testified that shortly before the events at the apartment complex he had seen Sparrow move a silver gun from his coat pocket to his waistband area. Appellant testified that he had begun running when an unknown man dressed in black with a gun drawn chased him, identifying himself only at the end of the chase as a policeman. Appellant denied that he had dropped anything.

## II.

### A.

On cross-examination of appellant, the prosecutor questioned him about his version of the events, including his denial that he recognized Officers Williams or Johnson as police who had been at the scene. The prosecutor continued:

[PROSECUTOR]: All right. By the way, do you know of—had you had prior contact with Officer Williams? Had you and he had any beefs before this?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[APPELLANT]: I don't—I don't even know him.

[PROSECUTOR]: You don't know him [Officer Williams] today?

[APPELLANT]: I mean from getting up here, I seen him now. I know him now. But I don't know him like I have no prior.

[PROSECUTOR]: But in February of 1996 through today you don't know of any reason why he would testify against you, do you?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Your Honor, can we approach?

THE COURT: No.

[APPELLANT]: Naw, I don't know.

[PROSECUTOR]: The answer is no, right?

[APPELLANT]: I don't know.

[PROSECUTOR]: You don't know whether you know of a reason or you don't know of a reason?

[DEFENSE COUNSEL]: Asked and answered.

[APPELLANT]: I don't know.

[PROSECUTOR]: The question is do you know of a reason why Officer Jonathan Williams would lie against you?

[DEFENSE COUNSEL]: Your Honor, asked and answered.

[APPELLANT]: I don't know.

THE COURT: Your objection's overruled. It's been answered.

[PROSECUTOR]: You don't know of a reason?

[APPELLANT]: I don't know what he will do.

[PROSECUTOR]: All right. And you don't know of a reason why Officer James Johnson would come in and lie against you, do you?

[APPELLANT]: I don't know what he would do.

[PROSECUTOR]: Do you know of a reason? Yes or no?

[APPELLANT]: Just I don't—I don't know, you know, what he would do.

[PROSECUTOR]: That's not my question. Do you know a reason or do you not know a reason yourself? Do you know a reason why Officer James Johnson would come into this courtroom and lie against you?

[APPELLANT]: What I'm saying I don't know what he would do.

### B.

The government concedes—certainly it did at oral argument—that when the prosecutor went beyond asking appellant whether he knew Officer Williams or had had prior contact with him, and asked whether he knew of any reason why either Williams or Officer Johnson "would come in and lie against you," the prosecutor disobeyed a prohibition firmly established by our decisions. At least since 1984, and in numerous opinions after that, we have made clear that a witness may not be asked to comment on the credibility of another witness, and that the prosecutor is thus prohibited from asking a criminal defendant on cross-examination to give a reason why the government's witnesses would testify falsely. In *Carter v. United States*, 475 A.2d 1118 (D.C.1984), we first took note of the practice, observed "[w]ith some frequency of late," whereby "the trial court permits the bar—most often the prosecution—to ask a series of recapitulation questions on cross-examination culminating ... in the witness' response that he is telling the truth and the contrary witnesses are lying." We declared this "inappropriate, for one witness may not express a view or an opinion on the ultimate credibility of another witness' testimony." *Id.* at 1126 (citation omitted). That same year, in *Green v. United States*, 481 A.2d 1310 (D.C.1984), the prosecutor had cross-examined the defendant by "capsuliz[ing] the testimony of several government witnesses seriatim, which contradicted Green's testimony, and ask[ing] him as to each of them whether he knew any reason why they would lie." *Id.* at 1310. Noting that the trial court had overruled Green's objections to this line of questions, we stated: "This was error. We have previously condemned this practice [citing *Carter, supra*]. We do so again." *Id.*

In *Freeman v. United States*, 495 A.2d 1183 (D.C.1985), the pattern of questioning began with the prosecutor establishing that the defendant did not know the government witnesses, and then asking whether he knew of a reason why the witnesses "would take the stand and under oath testify" as they had "if that weren't the case." *Id.* at 1187. We regarded this

as the same as "ask[ing] him if he knew of any reason why [they] might be lying," and again found it improper. *Id.* at 1186, 1188. In *Poteat v. United States,* 559 A.2d 334 (D.C.1989), citing *Carter, supra,* we held it improper for the prosecutor to ask the defendant "whether the officers had 'made a mistake' in their testimony that appellant had sold them ... drugs and that ... five dollar bills were found on appellant." *Id.* at 336. And in *McLeod v. United States,* 568 A.2d 1094 (D.C.1990), we found the same error in the prosecutor's asking the defendant "whether the testimony of several prior witnesses 'was accurate.'" This, we said, was equivalent to asking whether the other witness was lying or mistaken, and

> [w]e urge[d] that litigants in this jurisdiction desist from attempting to find "nice" distinctions between phrasings which we have already explicitly condemned and those we have not yet explicitly condemned. What is prohibited is seeking to have one witness comment or opine on the credibility of a prior witness, however phrased.

*Id.* at 1097. *See also Mitchell v. United States,* 569 A.2d 177, 183 (D.C.1990); *Wright v. United States,* 513 A.2d 804, 811 (D.C.1986). In our last published opinion addressing the issue until now, we stated again that "questioning by counsel which prompts one witness to suggest that he or she is telling the truth and that contrary witnesses are lying" is "patently improper." *Scott v. United States,* 619 A.2d 917, 924–25 (D.C.1993).

█ The reasons why this is so bear stating again. Credibility determinations are the province of the jury, not of witnesses asked to opine whether they believe another witness, and if not why. *See Carter,* 475 A.2d at 1126. Moreover, questions of this sort posit a false binary choice—either the other witness "lied" or he should be believed—when, as any prosecutor

knows (or should know), there may be multiple reasons short of perjury why a police officer's testimony in a given case may be questioned. Further, as appellant points out in his brief, since many of those reasons—such as obstructed vision or faulty memory—may be well beyond the defendant's knowledge or ability to assess, the questioning generally is not intended to seek information at all but instead to score rhetorical points. Such questions, one court has said, "have no probative value and are improper and argumentative because they do nothing to assist the jury in assessing witness credibility in its fact-finding mission." *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999); *see also State v. Graves,* 668 N.W.2d 860, 872 (Iowa 2003) ("the predominate, if not sole, purpose of such questioning is simply to make the defendant look bad" since "the accused's answer is unimportant"). At the same time, the questions are prejudicial because they "create the risk that the jury may conclude that, in order to acquit the defendant, it must find that the witness has lied," a risk that "is especially acute when the witness is a government agent in a criminal case." *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 237 (2002); *see also State v. Emmett,* 839 P.2d 781, 787 (Utah 1992) ("The prejudicial effect of such a question lies [partly] in the fact that ... it puts the defendant in the untenable position of commenting on the character and motivations of another witness who may appear sympathetic to the jury"); *State v. Casteneda–Perez,* 61 Wash.App. 354, 810 P.2d 74, 77 (1991) (same).

In its brief (though not at oral argument) the government suggested that asking a defendant if he knows of a reason *why* another witness would lie does not share the vice of asking him *if* he believes the witness was lying, and should be allowed. Aside from the fact (which the government acknowledges) that *Green* and

*Freeman, supra,* reject that distinction and bind this division, it does not hold up analytically. Either way, the question is put to the defendant on the false supposition that the witness must have perjured himself to be disbelieved. Even if we had not already rejected the distinction, we agree with the court in *Graves, supra,* that "prosecutors and trial judges will have more guidance in assuring proper examination of witnesses with a bright-line rule that bars such inquiries," 668 N.W.2d at 873, without fine distinction between whether the other witness is lying and why he might be doing so.

### C.

The government's primary argument on appeal is that the prosecutor's questions, although improper, were not prejudicial enough to warrant reversal. It concedes that appellant's objections at trial preserved the issue for review, and that our review therefore is for harmless error. The question is

> whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.

*Scott,* 619 A.2d at 924 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Freeman,* 495 A.2d at 1187–88 ("To determine whether there was substantial prejudice, we must balance the gravity of the misconduct, its relationship to the issue of the defendant's guilt, and any mitigating efforts made by the trial court against the strength of the government's case.").

Notwithstanding our numerous cases holding cross-examination of the sort engaged in here improper, the government points out that we have yet to reverse a conviction on that ground. But there is less in this fact than meets the eye. In some cases, such as *Freeman* and apparently *Carter, supra,* no objection was made to the questioning. *See Freeman,* 495 A.2d at 1188; *Carter,* 475 A.2d at 1124 (court "digress[es]" to note a practice which had occurred "[w]ith some frequency of late"). In *Scott, supra,* an objection was sustained and so the questions were not answered. *See* 619 A.2d at 925. In still other cases, the witness improperly questioned "was an insignificant defense witness," *Wright,* 513 A.2d at 811, or "the matters about which he was [questioned]" were conceded to be " 'seemingly immaterial,' " *Mitchell,* 569 A.2d at 183, or were at best "somewhat peripheral." *McLeod,* 568 A.2d at 1097. These decisions demonstrate only that the question of whether improper examination of this sort was prejudicial must be resolved in the particular setting of each case. *See, e.g., Green,* 481 A.2d at 1311 (error harmless "[i]n the context of this case").

In the case before us—applying the standards for prejudice enumerated above—the core issue was the credibility of the witnesses: of Officer Williams, who testified he had seen appellant throw the gun and cocaine (and of Officer Johnson who, though not seeing those actions, testified he had found a large sum of cash on appellant); of appellant, who denied he had possessed the gun, cocaine, or cash; and of Gregory Wright, who testified he had seen Ali Sparrow—and by implication not appellant—with the gun in his possession. The improper questioning implied that, unless Williams and Johnson were lying or appellant could explain why they would do so, his own testimony and Wright's should be disbelieved. Moreover, the questions were not asked merely once or twice; the prosecutor hammered at the theme as much as seven times despite appellant's answers that "I don't know" or

"I don't know what [the officer] will [or would] do." The fact that, as the government points out, appellant did not take the bait and accuse either officer of lying is immaterial: the import of the questions was that a non-answer was itself reason to credit the officers' testimony.

Of key importance, the prosecutor drove home in closing argument the point that appellant had been unable to give him "a straight answer" to the question of why the police had lied. After framing the issue substantially as whether the officers or appellant and Wright had told the truth, he concluded his initial summation by saying:

> And, finally, this is the Achilles' heel of the defendant's case, as opposed to the Government's case. The Government's case was straightforward. The officers had no motive to tell you a fib....
>
> The defendant's Achilles heel is, I asked Jayvan Allen directly, and you heard me, do you know of any reason why Officers James Johnson [and] Officer Jonathan Williams ... would have any reason to make up what they said about you. Did they have a particular beef with you, do you know? And, remember, he wouldn't give me a straight answer. Well, I don't know what they were thinking. Do you know of any reason? He couldn't produce one. And that's because there is no reason. [Tr. 54–55]

In rebuttal argument, the prosecutor once more reminded the jury that it was a zero-sum game: "Either Officers Williams [and] Johnson ... came in here and perjured themselves in a magnificent way and lied about everything they saw[,] or you believe Greg Wright and Jayvan Allen, childhood friends, about what happened that day." [1] [Tr. 91].

Not only, as we have explained, was witness credibility paramount to the jury's task, but it was an issue the jury found difficult to resolve. It deliberated over several days, sent out two notes saying that it could not reach a decision, and asked for reinstruction several times on matters such as the absence of any fingerprints or of a police report for a witness (Wright), the difference generally between physical and testimonial evidence, and whether it could "surmise that the gun came from Sparrow instead of [appellant] when it was thrown from the stairway." [2] "[I]n order to determine whether [an] error had 'substantial influence' we must also consider the jury's actions during deliberations." *Barron v. United States*, 818 A.2d 987, 993 (D.C.2003) (quoting *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239); *see also Brooks v. United States*, 367 A.2d 1297, 1309 (D.C.1976) ("Resolution of [the harmless error question] involves an examination of [among other things the] indicia of the trier's belief that the case is 'close' ... such as the length of deliberations and questions raised by the jury"). The communications from the jury, and its struggle with the case, confirm our own assessment from the record that the issue of whom to

---

1. The point is not that this closing argument was improper. Telling the jury, as the prosecutor partly did, that "there is no reason" in the evidence why it should discredit the government's witnesses is entirely permissible argument (though stating that appellant could not give him a "straight answer" regarding perjury is not). Appellant does not assert an independent error in the closing argument, to which he did not object; rather, as he states in his brief, "[the quoted passages were] a manifestation of the harm from the court's error [in overruling objection to the cross-examination] and a demonstration of the centrality of that error." [Reply Br. at 11 n. 3].

2. The trial court's instruction responding to the last question mentioned gives rise to appellant's second claim of error, one we do not reach given our disposition of the appeal.

believe was not so one-sided as to neutralize the impact of the prosecutor's questions.

Lastly, we consider what remedial measures if any the trial court took. Since the court overruled appellant's objections, the government is able to cite only the fact that in the final instructions the jury was told that it was the sole judge of credibility and that the arguments of counsel are not evidence. It is true that we have relied on this instruction before as partial reason to sustain a conviction despite improper questioning of the kind at issue here. *See Poteat,* 559 A.2d at 336 (also noting, however, that "[t]he government's case was strong"); *Freeman,* 495 A.2d at 1188 (no *plain* error; impact of the examination "was softened somewhat" by general instruction on credibility). But in none of those cases did the record demonstrate insistent questioning on the illicit theme combined with closing argument stressing the centrality—at least in the prosecutor's mind—of the defendant's inability to explain why the police officers would have lied. *See United States v. DeLoach,* 164 U.S.App. D.C. 116, 122, 504 F.2d 185, 192 (1974) ("[A prosecutor's] own estimate of his case, and of its reception by the jury at the time, is ... a highly relevant measure now of the likelihood of prejudice.") (citation and quotation marks omitted).

The government is thus left with an argument it does not make explicitly, which is that, as a practical matter, improper questioning of this kind is never reversible error because jurors applying their common sense can be relied upon to see the fallacy in the prosecutor's assumption—a rhetorical one anyway—that either the police officers lied or they should be believed. If this were invariably so, however, there would have been no need for us and other courts to "condemn" the practice as vigorously as we and they have, in part out of concern that it plays unfairly upon jurors' natural reluctance to attribute perjury to law enforcement officers. And, more basically, the "fair assurance" that *Kotteakos* requires before a reviewing court may disregard error—particularly one going to a central issue in the case—cannot rest so heavily on faith that the jury will do the right thing.

*Reversed and remanded for a new trial.*